IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Al Cea and Laura Cea, | ) | OPINION |
| | ) | |
| Plaintiffs and Appellants, | ) | Case No. 20100728-CA |
| | ) | |
| v. | ) | |
| | ) | F I L E D |
| Roger Hoffman; Modular | ) | (April 5, 2012) |
| Manufacturing, LLC; Investors | ) | |
| Collaborative, LLC, | ) | 2012 UT App 101 |
| | ) | |
| Defendants and Appellees. | ) | |

-----

Second District, Ogden Department, 080901240
The Honorable Ernest W. Jones

Attorneys:     Alex B. Leeman, Matthew F. McNulty III, and Florence M. Vincent, Salt Lake City, for Appellants
     David M. Wahlquist, Christopher S. Hill, and Gregory S. Moesinger, Salt Lake City, for Appellees

-----

Before Judges McHugh, Voros, and Roth.

VOROS, Associate Presiding Judge:

¶1     Appellants Al and Laura Cea appeal the trial court's entry of summary judgment in favor of Modular Manufacturing, LLC, Investors Collaborative, LLC, and Roger Hoffman (collectively Appellees).[1] We affirm in part and reverse in part.

---

1.  Hoffman holds a 90% interest in The Nexus Group, Inc., which holds a 50% ownership interest in Investors.  Investors is a Utah limited liability company that holds a 51% ownership interest in Modular.

BACKGROUND

¶2　　This case arises from the Ceas' unsuccessful attempt to purchase a modular log home and have it delivered to their property in California. In June 2006, the Ceas entered into a purchase agreement with American TimberCraft, LLC (ATC), a Utah limited liability company. Pursuant to that agreement, the Ceas made a down payment of $172,116—half the total purchase price—to ATC. ATC incurred financial difficulties and never began construction of the home. In November 2006, ATC signed an agreement with Modular in which Modular "acquir[ed] from ATC its work in progress and pending orders along with all related deposits and down payments," including the Ceas' $172,116.

¶3　　Six months later, Modular sent the Ceas a letter (the Modular Letter) explaining that ATC had "ceased operations," "liquidated all company assets," and was "no longer capable of completing or performing on its contract with [the Ceas]." However, the Modular Letter added, "all is not lost." Modular had acquired ATC's assets and proposed two options. The first option was for Modular to complete the Ceas' log home:

> Although Modular did not purchase [ATC] itself[,] as part of the asset acquisitions[] Modular agreed to complete all work in progress, including orders for which deposits have been taken (even if no physical work has commenced). Therefore if you had an order with [ATC], Modular has agreed to complete the work on your home for the previously agreed price, even though it did not acquire your actual contract from [ATC]. . . .
>
> If you decide that you would like to proceed, enter into a new contract and have your home completed, there are some minor modifications to terms and payment schedules. However the specifications for the home itself will not change nor will the price.

The second option was for Modular to refund the Ceas' deposit:

> At this point in time we (as [Modular]) will be issuing new contracts for your home construction (regardless of what stage of construction it may be in) in order to complete

and give you the assurance of a valid contract for performance.  In lieu of a new contract we will be willing to pay you whatever deposits or payments you made to [ATC] for your home should you decide that you would prefer to cancel and just walk away.

The Modular Letter was sent by Modular; it appears that neither Investors nor Hoffman signed the letter.

¶4     The Ceas responded with a letter (the First Cea Letter) purporting to accept Modular's proposal to build and deliver the home.  However, the Ceas sought to change the specifications and place of delivery of the home and sought additional terms not offered by Modular, including a new delivery date:

> Please prepare a new contract for us showing the $172,116 paid in thr[ough] June 7, 2006.  We wish to delete the garage.  Also, please reflect the 5% of total contract to be retained by us and paid upon final setting . . . of log shell.

> [W]e are changing the location of the job, our frustration with this project has taken a great toll on us in more ways than you can imagine.  We . . . will take delivery on a new parcel . . . [and] we will obtain all necessary permits . . . .

> We hope and expect our new delivery date for this shell to be on or before July 31, 2007.

¶5     Modular did not respond to the First Cea Letter.  One week later, the Ceas sent a second letter (the Second Cea Letter) purporting to accept Modular's proposal to refund their deposit:

> Upon further consideration, we respectfully request that, in accordance with your December letter, you refund the $172,116 we have paid as a deposit on our log home.

> Please send a check at your earliest convenience . . . .

> This has been a very difficult decision for us, but we
> don't believe your company can deliver a log home to us in
> any reasonable time frame.

¶6     Modular did not respond to the Second Cea Letter, nor did it refund the Ceas' deposit.  Accordingly, in February 2008, the Ceas sued a number of defendants, including Modular, Investors, Hoffman, and ATC.  The Ceas alleged (1) breach of contract for failure to build and deliver their home or, alternatively, for failing to refund the Ceas' deposit; (2) fraud or intentional misrepresentation; and (3) negligent or reckless misrepresentation.  These causes of action all arose out of the Modular Letter.[2]

¶7     Appellees successfully moved for summary judgment.  The trial court ruled that Hoffman "is not personally liable for the actions of Modular" because "Hoffman never made any personal representations to the Ceas and that any action by Hoffman was limited to his capacity as a representative of [Modular]."  It further ruled that Investors "is not personally liable for the actions of Modular" because Investors "never made any representations to the Ceas, and that any action by Investors was limited to its capacity as a representative of Modular."  Finally, the court ruled that Modular and the Ceas never formed a binding contract and that Modular made no fraudulent or negligent misrepresentations.  The Ceas appeal.


ISSUES AND STANDARDS OF REVIEW


¶8     The Ceas assert three principal claims of error.  First, they contend that summary judgment should not have been granted, because discovery was not complete.  Next, they contend that a genuine issue of material fact exists as to whether Hoffman is personally liable for his role in making distributions from Modular while Modular was insolvent.  Finally, they contend that a genuine issue of law exists as to whether the Ceas and Modular formed a contract.

¶9     We review a grant or denial of summary judgment for correctness, affording the trial court no discretion, and we view all the facts and reasonable inferences in the light most favorable to the nonmoving party.  *See Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d

---

2.  The Ceas did not allege breach of a third party beneficiary contract, *see, e.g., Rio Algom Corp. v. Jimco Ltd.,* 618 P.2d 497, 506 (Utah 1980), or assignment, *see, e.g., Winegar v. Froerer Corp.,* 813 P.2d 104, 107–08 (Utah 1991).

600.  Whether a contract exists between parties is ordinarily a question of law, reviewed for correctness.  *See Herm Hughes & Sons, Inc. v. Quintek*, 834 P.2d 582, 583 (Utah Ct. App. 1992).  However, "'[a] motion for summary judgment may not be granted if . . . there is a factual issue as to what the parties intended.'"  *West One Trust Co. v. Morrison*, 861 P.2d 1058, 1062 (Utah Ct. App.1993) (omission in original) (quoting *Winegar v. Froerer Corp.,* 813 P.2d 104, 108 (Utah 1991)).


ANALYSIS

I.  Incomplete Discovery

¶10     The Ceas contend that the trial court erred in granting summary judgment because, at the time the court heard and ruled on the summary judgment motion, discovery was not complete.  They note that "this fact was made known to the district court in the Ceas' opposition to the Appellees' motions for summary judgment as well as in oral arguments."

¶11     The Ceas argued below that the existing record demonstrated that Hoffman played a substantial role in Modular's allegedly unlawful distributions.  However, they also sought to obtain through discovery additional facts to support this allegation.  Because Modular's responses to their discovery requests were allegedly deficient, the Ceas filed a motion to compel.  They filed the motion four months after the close of fact discovery under the scheduling order, three months after the Appellees had filed their motions for summary judgment, and one month after the Appellees had filed notices to submit their summary judgment motions for decision.  While the motion to compel was pending, the trial court heard and granted the Appellees' motions for summary judgment.  The Ceas contend that the court's ruling was premature because discovery was incomplete.  "Had Hoffman provided the Ceas with the discovery they requested, but which Hoffman failed to provide, such discovery would have supported the Ceas' argument," they contend.

¶12     "We generally review a trial court's discovery rulings for an abuse of discretion, but when a trial court does not rule on outstanding discovery motions and thereby fails to exercise its discretion, 'the issue of whether or not it should have [decided the outstanding motions] presents a legal question which is subject to de novo review.'"  *Bluemel v. Freestone*, 2009 UT App 16, ¶ 4, 202 P.3d 304 (quoting *Energy Mgmt. Servs., LLC v. Shaw,* 2005 UT App 90, ¶ 8, 110 P.3d 158).  "Generally, summary judgment should not be granted if discovery is incomplete since information sought in discovery

may create a genuine issue of material fact sufficient to defeat the motion." *Id*. ¶ 5. Here, however, any possible error committed by the trial court was invited by the Ceas.

¶13   The invited error doctrine "is crafted to discourage parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal," as well as "to give the trial court the first opportunity to address the claim of error." *State v. Geukgeuzian*, 2004 UT 16, ¶ 12, 86 P.3d 742 (internal quotation marks and brackets omitted).  Under the invited error doctrine, "a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *Id*. ¶ 9 (internal quotation marks omitted).  "Affirmative representations that a party has no objection to the proceedings fall within the scope of the invited error doctrine because such representations reassure the trial court and encourage it to proceed without further consideration of the issues." *State v. Winfield*, 2006 UT 4, ¶ 16, 128 P.3d 1171.

¶14   The Ceas did just that.  At the outset of the motion hearing the trial court asked Cea's counsel, "the motion to compel, we don't need to deal with.  Do you agree with that, [counsel]?"  To which the Ceas' counsel responded, "Yes.  I don't think the motion to submit has been filed."  This affirmative representation by the Ceas' counsel "reassure[d] the trial court and encourage[d] it to proceed without further consideration of the issue[]." *See Winfield,* 2006 UT 4, ¶ 16.  Accordingly, we decline to review this claim of error.

## II.  Fraud

### A.  Hoffman

¶15   The Ceas contend that the trial court erred by ruling as a matter of law that Hoffman could not be held personally liable for fraud or intentional misrepresentation. They contend that, notwithstanding curtailed discovery, record evidence creates a genuine issue of material fact as to whether Hoffman made distributions in violation of the Utah Revised Limited Liability Company Act, *see* Utah Code Ann. § 48-2c-602 (2010),[3] and "whether Hoffman was a mere agent of Modular or whether Hoffman had a more substantial relationship with Modular that would impose personal liability upon him for his actions."  In support of these claims, the Ceas' brief relies principally on two portions of the record.

---

3. We cite to the current version of the code as a convenience to the reader because the relevant provisions have not been substantively amended since the events relevant to this appeal occurred.

¶16    First, the Ceas allege that "Modular did in fact make distributions, that such distributions were made while Modular was insolvent, and that Hoffman played a substantial role in Modular's decision to make those insolvent distributions."  We have reviewed the pages of the record cited in support of this statement and do not agree that they support the propositions for which the Ceas cite them.

¶17    In particular, we do not agree that in his deposition Hoffman testified—or that it may reasonably be inferred from his testimony—that he "played a substantial role in Modular's decision to make those insolvent distributions."  In fact, when asked about what happened to computers, software, and other equipment owned by Modular, Hoffman did not testify from personal experience, but stated, "I know the process."  The process he described was that someone else "decided that he would take some FranklinSquires staff, or whatever, and they would physically go up and get all of the tools, equipment, and that included the computers and all that.  They put them in their office facility, which had a large warehouse attached."[4]  This deposition testimony does not support a reasonable inference that Hoffman authorized Modular to make distributions or that any such distributions were unlawful.

¶18    Second, the Ceas allege that "Hoffman testified that he authorized distributions by Modular when Modular was a 'financial train wreck.'"  We have reviewed the pages of the record cited in support of this statement and, again, we conclude that they do not support the proposition for which the Ceas cite them.

¶19    The portions of Hoffman's depositions relied on do not describe Hoffman's authorizing distributions by Modular when Modular was "a financial train wreck," but describe Investors' forming Modular for the purpose of acquiring "certain assets from ATC" at a time when ATC was "a financial train wreck."  Investors sought to "acquire only certain assets" of ATC because ATC had developed "an incredible product, but the company itself was a financial disaster."  Accordingly, Investors "determined that no, we don't want to buy the company.  They had a closet full of financial skeletons that we did not want to go into."  This testimony does support a reasonable inference that ATC was insolvent, but not that Modular was insolvent, as the Ceas allege.

---

4. FranklinSquires Investments, LLC holds a 50% ownership interest in Investors.

¶20   In sum, the Ceas have not demonstrated a genuine issue of material fact with respect to this claim. We therefore affirm the trial court's ruling on this point.[5]

B. Modular

¶21   The Ceas also contend that they detrimentally relied on Modular's and Investors' representations "by not seeking recovery of the money paid towards the construction of their modular home by pursuing claims against Modular and other defendants in the underlying case until after Modular had already ceased operations and Modular's assets were already looted by Investors." This argument is unsupported by any citations to the record. It is thus inadequately briefed. *See* Utah R. App. P. 24(a)(9) ("The argument shall contain . . . the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the . . . parts of the record relied on."). Moreover, the premise of the argument—that Modular was a "financial train wreck"—is not supported by the portions of the record the Ceas cite elsewhere in their brief.

¶22   In sum, the Ceas' assertion that a genuine issue of material fact exists as to whether Hoffman or Modular committed fraud against the Ceas is not supported by citations to the record on appeal. We thus affirm the trial court on this issue.

### III. Contract Claims

¶23   The Ceas contend that the trial court erred by ruling as a matter of law that the Modular Letter was not an offer, that neither the First nor Second Cea Letter was an acceptance, and that no consideration existed for a contract. As we understand their argument, the Ceas maintain that the Modular Letter contained two alternative offers: (1) an offer to complete ATC's agreed performance, and (2) an offer to refund the Ceas' deposit. The Ceas argue that the First Cea Letter constituted a valid acceptance of the offer to complete performance. Alternatively, the Ceas argue that the Second Cea Letter constituted a valid acceptance of the offer to refund their deposit.

---

5. The Ceas also claim that Hoffman "personally authorized" the Modular Letter and therefore is contractually liable to them. As this claim appears to rest on the same factual theory we determine is unsupported by the record, it also fails.

¶24 Generally, formation of a contract requires an offer, an acceptance, and consideration. *See Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985). An offer is a "'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to the bargain is invited and will conclude it.'" *Engineering Assocs. v. Irving Place Assocs.*, 622 P.2d 784, 787 (Utah 1980) (quoting Restatement (Second) of Contracts § 24) (1981). "For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous." *DCM Inv. Corp. v. Pinecrest Inv. Co.*, 2001 UT 91, ¶ 12, 34 P.3d 785. The obligations of the parties must be "set forth with sufficient definiteness that [the contract] can be performed." *Ferris v. Jennings*, 595 P.2d 857, 859 (Utah 1979); *see* 1 *Williston on Contracts* § 4.21, at 644 (4th ed.) (discussing the definiteness of offers and noting that "[a] lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations to the agreement"). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33(2). An offer (other than an option contract) may be withdrawn at any time before acceptance. *See J.R. Stone Co. v. Keate,* 576 P.2d 1285, 1288 (Utah 1978).

¶25 "An acceptance is a manifestation of assent to an offer, such that an objective, reasonable person is justified in understanding that a fully enforceable contract has been made." *Cal Wadsworth Constr. Co. v. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995). It "must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer." *Id.* "An offeree's proposal of different terms from those of the offer constitutes a counteroffer, and no contract arises unless the original offeror accepts it unconditionally." *Id.* at 1377; 1 *Corbin on Contracts* § 3.27 (1993) ("Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer."). Generally, a counteroffer "operates as a rejection of the original offer." 1 *Williston on Contracts* § 5.3, at 908 (4th ed.); *Burton v. Coombs*, 557 P.2d 148, 149 (Utah 1976) (noting that a counteroffer rejects the offer). The offeree's power to accept the original offer is thereby terminated. *See Burton*, 557 P.2d at 149. However, "[i]f the original offeror accepts the counteroffer before it is withdrawn, a binding contract is created." *Cal Wadsworth Constr. Co.*, 898 P.2d at 1378 (citing *R.J. Daum Constr. Co.*, 247 P.2d 817, 819 (Utah 1952)).

¶26 "Consideration is present when there is an act or promise given in exchange for the other party's promise." *Healthcare Servs. Group Inc. v. Utah Dep't of Health*, 2002 UT 5, ¶ 17, 40 P.3d 591 (citing *Aquagen Int'l, Inc. v. Calrae Trust*, 972 P.2d 411, 413 (Utah

1998)). "Thus, 'there is consideration whenever a promisor receives a benefit or where [a] promisee suffers a detriment, however slight.'" *Id*. (quoting *Gasser v. Horne,* 557 P.2d 154, 155 (Utah 1976) (alteration in original)).

¶27    The proponent of the contract "has the burden of showing that an offer and acceptance were more probable than not." *Sackler v. Savin*, 897 P.2d 1217, 1222 (Utah 1995). Whether a contract exists between parties is ordinarily a question of law, reviewed for correctness. *See Herm Hughes & Sons, Inc. v. Quintek*, 834 P.2d 582, 583 (Utah Ct. App. 1992). Here, Appellees contend that the essential facts are undisputed. Although the Ceas frame the issue as one of fact—and disputed fact at that—they also argue that, given the existing factual picture, "a binding contractual relationship exists between these parties." We thus consider the question before us to be whether the undisputed facts show that the parties formed a contract under the foregoing principles of contract formation.

¶28    We first consider whether the parties formed a contract for the completion of construction. The Ceas challenge the trial court's ruling that the Modular Letter did not operate as an offer to complete construction due to the indefinite and uncertain nature of the contractual terms. However, we agree with Modular that, even if the Modular Letter operated as an offer, the First Cea Letter constituted a counteroffer and thus a rejection. As Modular notes, the First Cea letter sought to change material terms, including the specifications of the home, the location of delivery, and the time for completion of performance. The First Cea Letter was, therefore, a counteroffer that Modular did not accept. Accordingly, we affirm the trial court's ruling that the Ceas and Modular did not enter into a contract for Modular to complete construction and delivery of the home.

¶29    We next consider whether the parties formed a contract for the return of the Ceas' $172,116 deposit. Again, the trial court ruled that the Modular Letter was too indefinite and uncertain in its terms to operate as an offer. Modular likewise asserts that the Modular Letter was too indefinite to constitute a valid offer to refund the Ceas' deposit, because it was made in the context of a letter that had alternatives and options, indicating that the parties had not determined a course and were merely negotiating. We disagree.

¶30    The Modular Letter states that the Ceas may receive their deposit back instead of continuing with the construction and delivery of their home: "In lieu of a new contract

we will be willing to pay you whatever deposits or payments you have made to ATC for your home should you decide that you would prefer to cancel and just walk away." It therefore expresses assent on behalf of Modular to refund the Ceas' deposit and it empowers the Ceas to accept that refund, end its relationship with Modular, "and walk away." Further, both parties were aware of the precise amount the Ceas had deposited, $172,116. The Modular Letter was therefore an effective offer to refund the deposit.

¶31    As noted above, the First Cea Letter included a counteroffer to Modular's proposal to complete construction. However, by not accepting that counteroffer, Modular left the Ceas free to withdraw it, which they effectively did in the Second Cea Letter. The Second Cea Letter also operated as an acceptance of Modular's offer to refund the deposit. That letter clearly states, "Upon further consideration, we respectfully request that, in accordance with your December letter, you refund the $172,116 we have paid as a deposit on our log home." Nothing suggests that "the parties had not come to an agreement on the essential terms of the contract." *See Sackler v. Savin*, 897 P.2d 1217, 1221 (Utah 1995).

¶32    However, Modular contends that the First Cea Letter, by countering and thus rejecting the offer to build and deliver the home, also effectively rejected the offer to refund the Ceas' $172,116 deposit. In more general terms, Modular argues that where an offeree receives two mutually exclusive offers, a counteroffer to the first offer rejects not only the first offer, but the second as well.

¶33    Even if this position were true as a general matter—a question on which we express no opinion—it is not true here. A counteroffer operates as a rejection of an offer because "it is interpreted as being, in effect, a statement by the offeree not only that he will enter into the transaction on the terms stated in his counteroffer, but also by implication that he will not assent to the terms of the original offer." 1 *Williston on Contracts* § 5.3, at 911 (4th ed.). Here, the Ceas' sequential responses to Modular's alternative offers must be viewed in light of the elephant in the room: Modular was holding the Ceas' $172,116 deposit. The counteroffer in the First Cea Letter may be interpreted as a statement by the Ceas, by implication, that they rejected Modular's proposal to complete construction. But it may not reasonably be interpreted as a statement by the Ceas, by implication, that they also rejected Modular's offer to refund their $172,116 deposit.

¶34    In simple terms, Modular said, "We have your $172,116.  Do you want us to return the money or finish the job?"  By counteroffering—and then withdrawing their counteroffer before Modular accepted it—the Ceas replied, in effect, "We don't want you to finish the job."  The unstated implication of this reply was not "so just go ahead and keep our money"; it was, if anything, "so just go ahead and refund our money."  Accordingly, the First Cea Letter did not reject Modular's refund offer, and the Second Cea Letter accepted it.

¶35    Finally, the Ceas contend that the trial court erred in ruling as a matter of law that the agreement was not supported by consideration.  Modular conceded at oral argument that, assuming the Modular Letter operated as an offer to refund the Ceas' deposit and the Second Cea Letter operated as an acceptance of that offer, the resulting agreement was supported by adequate consideration.[6]

¶36    Consequently, we hold that the trial court erred in ruling as a matter of law that no contract was formed between Modular and the Ceas with respect to the return of the Ceas' $172,116 deposit.  We conclude that the undisputed record facts, together with Modular's concession on appeal, demonstrate that a contract was formed between the Ceas and Modular for the return of the Ceas' $172,116 deposit.[7]

IV.  Remaining Issues

¶37    In addition to the foregoing issues, the Ceas raise a number of challenges to the form of the trial court's rulings.  These challenges either lack merit or are rendered moot by our decision.  Accordingly, we do not address them further.  Nor do we address the Ceas' claim based on the Uniform Commercial Code, as it was raised for the first time in their reply brief.  *See Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 ("It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." (internal quotation marks omitted).

---

6. This concession finds support in the record.

7. The Ceas also contend that the record facts demonstrate the existence of a genuine issue of material fact as to whether Investors or Hoffman or both share Modular's contractual liability.  For reasons explained above, we reject this contention.

CONCLUSION

¶38    We conclude as a matter of law that Modular and the Ceas formed a contract for the return of the Ceas' $172,116 deposit, and we thus reverse the ruling of the trial court on this point.  In all other respects, we affirm the ruling of the trial court.  The case is remanded for further proceedings consistent with this opinion.  No costs or fees are awarded.


_____
J. Frederic Voros Jr.,
Associate Presiding Judge


-----


¶39    WE CONCUR:


_____
Carolyn B. McHugh,
Presiding Judge


_____
Stephen L. Roth, Judge