2014 UT App 101

**VERDI ENERGY GROUP, INC.,**
Plaintiff and Appellant,

v.

**Greg NELSON and Brigham Lundahl,**
Defendants and Appellees.

No. 20130013–CA.

Court of Appeals of Utah.

May 1, 2014.

Justin D. Heideman and R. Brett Evanson, for Appellant.

James E. Slemboski and Daniel J. Tobler, for Appellees.

Judge STEPHEN L. ROTH authored this Opinion, in which Judges JAMES Z. DAVIS and MICHELE M. CHRISTIANSEN concurred.

## Opinion

ROTH, Judge:

¶ 1 Verdi Energy Group, Inc. (Verdi) appeals from the district court's decisions to grant summary judgment in favor of Greg Nelson and Brigham Lundahl and to award Nelson and Lundahl their attorney fees. We affirm the summary judgment decision but reverse and vacate the award of attorney fees.

## BACKGROUND [1]

¶ 2 Nelson, Lundahl, and their wives owned real property containing a hydrother-

---

1. We recite "the facts and all reasonable inferences drawn therefrom in the light most favor-

mal well in Iron County, Utah. The Nelsons were 20% owners of the property, while the Lundahls owned 80%. On February 11, 2009, Verdi offered to purchase the property, including the well and certain water rights, for $400,000 with a closing date in July 2009. Verdi presented its offer on a standard real estate purchase contract (REPC) form, naming Nelson and Lundahl as the sellers (collectively, the Sellers), but not their wives. Verdi provided $8,000 in earnest money. The Sellers made a counteroffer by interlineating handwritten changes directly on the REPC and marking "COUNTEROFFER" on the signature form, which was labeled "ACCEPTANCE/COUNTEROFFER/REJECTION." The changes included a higher purchase price of $500,000 and a closing date in June 2009 rather than July. Nine days later, on February 20, Verdi sent the Sellers Addendum No. 3. Addendum No. 3 proposed the same purchase price and closing date as the Sellers' counteroffer but included a more specific legal description of the subject property (together with a detailed reference to the recorded warranty deed that had transferred ownership of the property to Nelson, Lundahl, and their wives), gave Verdi complete access to the property for purposes of conducting due diligence, and added a confidentiality provision relating to the results of Verdi's due diligence activities. Addendum No. 3 gave the Sellers until February 21, 2009, to accept its terms and provided that "[u]nless so accepted, the offer as set forth in this ADDENDUM shall lapse." The Sellers did not respond.

¶ 3 Negotiations continued for a period of months, during which Verdi made a second similar offer, which the Sellers ignored, and Lundahl presented his own offer that would have required Verdi to put $100,000 down prior to closing as evidence of its ability to purchase the property, which Verdi refused. Finally, in May 2009, Verdi presented the Sellers with Addendum No. 6. Nelson checked the acceptance box and signed his name, but Lundahl did not respond. According to Verdi, it believed its offer had been accepted, so it then undertook a number of activities that it claims amounted to part performance under the REPC. The Sellers characterize these activities as simple due diligence contemplated by the REPC provision that allowed Verdi to cancel the contract if it was unsatisfied by the results of any inspections of the property. In June 2009, the Sellers informed Verdi that they no longer wished to sell the property.

¶ 4 On July 22, 2009, Verdi filed a complaint against the Sellers, asserting breach of contract, breach of the covenant of good faith and fair dealing, anticipatory repudiation, and constructive trust. On August 17, 2010, the Sellers moved to dismiss Verdi's complaint on the basis that the documents exchanged between the parties showed that they had never entered into a contract. The Sellers asserted that no contract had arisen from the exchange of offers and counteroffers, as evidenced by the fact that neither the REPC nor any of the addenda had been executed by Verdi as buyer and both Lundahl and Nelson as sellers. The Sellers also pointed out that their wives, who were joint owners of the property, had not executed any of the documents and that as a consequence, there was no agreement for the sale of the property that satisfied the Utah Statute of Frauds. The district court denied the Sellers' motion to dismiss without explanation.

¶ 5 Verdi then amended the complaint to add claims of fraud and negligent misrepresentation, asserting that the Sellers had represented that they had full authority to sell the property and were now claiming that they could not bind their wives. Verdi claimed that these representations were made in the original written REPC and during oral negotiations leading up to Addendum No. 6. In its prayer for relief, Verdi sought specific performance of the purchase contract, imposition of a constructive trust on the property, or damages from the Sellers' failure to perform the contract.

¶ 6 On February 9, 2011, the Sellers again moved to dismiss. With regard to the contract, negligent misrepresentation, anticipa-

able to the nonmoving party." *Orvis v. Johnson,* 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and inter-

nal quotation marks omitted).

tory repudiation, and constructive trust claims, the Sellers once again asserted that neither the REPC nor the various addenda were enforceable because none of the documents had been accepted by both Verdi and the Sellers and because none complied with the statute of frauds, which states that "[e]very contract ... for the sale, of any lands ... [must be] in writing subscribed by the party by whom the ... sale is to be made, or by his lawful agent thereunto authorized in writing." Utah Code Ann. § 25–5–3 (Lexis-Nexis 2013).[2] The Sellers also claimed that Verdi could not prevail on a fraud claim because it could not have reasonably relied upon the Sellers' failure to disclose their wives' ownership interests during negotiations or in the execution of Addendum No. 6 when due diligence on Verdi's part would have revealed a record title that showed the wives as co-owners. At a hearing on the motion in June 2011, the district court "determined that a motion to dismiss was not proper" but that it "would hear the matter as a motion for summary judgment." Verdi requested a continuance, which the court granted on the basis that it needed additional briefing about whether the Sellers could bind their wives to the contract and whether Verdi's real estate agent was aware that the property had four owners, rather than two. The parties subsequently submitted additional documentation on the issue of the Sellers' authority to bind their wives to the contract.

¶ 7 On October 25, 2011, the Sellers filed a second request to submit their motion for summary judgment. Verdi requested a hearing, but on November 1, 2011, the district court granted summary judgment to the Sellers without a hearing and in a summary order that stated simply, "Motion Granted."[3] Counsel for the Sellers then prepared a supplemental order, detailing the bases for the court's ruling, to which Verdi filed a written objection. On January 3, 2012, the court issued the supplemental order, in which it concluded that Verdi's claims for breach of contract, breach of good faith and fair dealing, anticipatory repudiation, and constructive trust failed because "no contract exists" where the REPC had never been executed and neither Lundahl nor the wives had signed Addendum No. 6. It further ruled that no principal—agent relationship existed that authorized Lundahl's and Nelson's execution of the REPC or Addendum No. 6 on their wives' behalf. The district court also concluded that Verdi's fraud claim failed because by the exercise of reasonable diligence, Verdi could have learned that the wives had an interest in the property, and Verdi therefore could not show reasonable reliance on any representation by the Sellers that they owned the property. Finally, the court determined that Verdi's negligent misrepresentation claim failed because Verdi could not have reasonably relied upon any representations made in the REPC when it was never fully executed. Consequently, the court dismissed all six causes of action with prejudice.

¶ 8 The January 3 supplemental order also awarded the Sellers $18,944 in attorney fees under the bad faith statute. *See* Utah Code Ann. § 78B–5–825 (LexisNexis 2012). The award of fees was apparently based on a December 29, 2011 affidavit prepared by one of the Sellers' attorneys. That affidavit was not accompanied by a written motion requesting fees, and the affidavit itself did not describe any basis for awarding attorney fees. The affidavit described the work done in very broad terms, concluding simply with the attorney's "opinion that the [$18,944 in] attorney's fees as stated herein are fair and reasonable." The supplemental order explained that an award of bad faith attorney fees was justified because

> there was clearly no contract between the parties when the action was initiated and the goal, it appears, was to stop or delay the [Sellers] from moving forward with other ventures while [Verdi] attempted to gather funds and ultimately force the [Sellers] to sell [Verdi] the property. In other

---

2. The statutory provisions cited in this opinion have not been amended since the time of the underlying proceedings. We therefore cite the current version of the Utah Code.

3. The summary order and a subsequent supplemental order both refer to the motion granted on November 1 as a motion to dismiss, but the court actually considered the motion as one for summary judgment. Accordingly, we will treat it as a summary judgment ruling on appeal.

words, [Verdi] used the present lawsuit to encumber the property and attempt to coerce the [Sellers] into selling it the property. Thus, [Verdi] brought this action without merit and not in good faith.

¶ 9 In its written objection, Verdi challenged the merits of the bad faith determination and the lack of factual findings to support it. Verdi also objected on the basis that the court had never made a ruling on bad faith attorney fees in prior proceedings and there had been no hearing on the issue. The district court issued its supplemental order without a hearing and without addressing these objections. Verdi then filed several postjudgment motions, including a motion for relief from judgment, an objection to the sufficiency of the affidavit supporting the request for attorney fees, and a motion for the court to enter more detailed findings on its denial of the motion for relief from judgment. The district court apparently heard from the parties on these issues at a hearing in September 2012. Following that hearing, the court entered an order, prepared by Verdi's counsel, in which it noted that its January 3 award of attorney fees had been "premature" but that it was now awarding the Sellers "their attorney fees in the amount requested in their Affidavit of Attorney Fees." The order provides neither a basis for the award nor any further findings to support it. The transcript from the September 2012 hearing is not part of the record on appeal.

## ISSUES AND STANDARDS OF REVIEW

¶ 10 Verdi asserts that the district court erred in four ways. The first three challenges relate to the grant of summary judgment. First, Verdi claims that the district court erred in granting summary judgment on its breach of contract and breach of the covenant of good faith and fair dealing claims because the court "failed to properly apply the doctrine of partial performance as an exception to the statute of frauds." Second, Verdi asserts that the court erred in dismissing its constructive trust claim because the

court failed to recognize that execution of the contract transferred equitable title to Verdi. Third, Verdi contends that the court erred in granting summary judgment on the fraud and negligent misrepresentation claims because there were issues of material fact regarding whether Verdi could reasonably have relied on the Sellers' representations that they had full authority to sell the property.[4]

¶ 11 In an appeal from the grant of summary judgment, "[a]n appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted). The propriety of the court's grant of summary judgment in this case turns upon the existence of a contract. "Whether a contract exists between parties is ordinarily a question of law, reviewed for correctness." *Cea v. Hoffman*, 2012 UT App 101, ¶ 27, 276 P.3d 1178.

¶ 12 Finally, Verdi challenges the district court's award of bad faith attorney fees. Verdi contends that the court's determinations that the case was meritless and not brought in good faith were not sufficiently supported by the record to justify an award of bad faith attorney fees and that, in any event, the Sellers' affidavit was inadequate under rule 73 of the Utah Rules of Civil Procedure to support a fee award.

¶ 13 "We review a trial court's grant of attorney fees under [the bad faith statute] as a mixed question of law and fact." *Gallegos v. Lloyd*, 2008 UT App 40, ¶ 6, 178 P.3d 922. An award of attorney fees under the bad faith statute must be supported by separate determinations that the claims were asserted in bad faith and that they lacked merit. *Still Standing Stable, LLC v. Allen*, 2005 UT 46, ¶ 12, 122 P.3d 556. "A finding of bad faith is a question of fact and is reviewed by this court under the 'clearly erroneous' standard." *Jeschke v. Willis*, 811

---

**4.** Verdi does not make any arguments directly challenging the district court's grant of summary judgment on the anticipatory repudiation claim.

P.2d 202, 204 (Utah Ct.App.1991). "The 'without merit' determination is a question of law, and therefore we review it for correctness." [5] *Id.* at 203–04.

## ANALYSIS

### I. The Summary Judgment Claims

¶ 14 It is the burden of the "proponent of the contract ... [to] show[ ] that an offer and acceptance" occurred. *Cea,* 2012 UT App 101, ¶ 27, 276 P.3d 1178 (citation and internal quotation marks omitted). "An offer is a manifestation of willingness to enter into a bargain," as evidenced by definite and unambiguous terms. *Id.* ¶ 24 (citations and internal quotation marks omitted). To accept an offer, one "must unconditionally assent to all material terms presented in the offer, including price and method of performance." *Id.* ¶ 25 (citation and internal quotation marks omitted). Failure to accept all of the offered terms, whether by offering different terms or by failing to respond at all, amounts to a rejection of the contract. *Id.*

¶ 15 Thus, when an offeree responds to an offer with a "proposal of different terms from those of the offer," the offeree has made "a counteroffer, and no contract arises unless the original offeror accepts [the counteroffer] unconditionally." *Id.* (citation and internal quotation marks omitted); 1 *Corbin on Contracts* § 3.28 (1993) ("Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer."). Once a counteroffer is made, "[t]he offeree's power to accept the original offer is thereby terminated." *Cea,* 2012 UT App 101, ¶ 25, 276 P.3d 1178. And the original offeror must accept the counteroffer unconditionally for a contract to result. *Id.* As with the original offer, failure to respond to the counteroffer constitutes a rejection. *See id.;* Restatement (Second) of Contracts § 36 (1981).

¶ 16 The facts relating to the various transactions between Verdi and the Sellers are undisputed. Thus, the question before us is whether those facts demonstrate that a contract for the sale of the property was actually formed. Verdi asserts that a contract arose out of its February 2009 presentation of the REPC, the Sellers' counteroffer, Verdi's Addendum No. 3 response, and Nelson's acceptance of Addendum No. 6 in May 2009. We conclude that the district court correctly determined that the parties' negotiations did not result in a contract.

¶ 17 On February 11, 2009, Verdi offered to purchase the property, including the well and certain water rights, for $400,000, with a closing date in July 2009. The offer was accompanied by $8,000 in earnest money. Verdi made the offer in the form of a REPC. Paragraph 23 of the REPC provided that " '[a]cceptance' occurs when Seller or Buyer, responding to an offer or counteroffer of the other (a) signs the offer or counteroffer where noted to indicate acceptance; and (b) communicates to the other party or to the other party's agent that the offer or counteroffer has been signed as required."

¶ 18 The Sellers responded to Verdi's offer by making handwritten interlineations on the face of the REPC itself that, among other things, increased the purchase price to $500,000 and moved the closing date forward from July to June 2009. The Sellers then checked the "counteroffer" box on the last page of the printed form (leaving blank the "acceptance" box just above it), initialed and signed it, and returned it to Verdi. The counteroffer box advised Verdi that the counteroffer "present[ed] *for Buyer's Acceptance* the terms of Buyer's offer *subject to* the exceptions or modifications as specified" in the handwritten interlineations.[6] (Emphasis added.) Thus, by its own terms, the Sellers' response to Verdi's REPC was a counteroffer, not an acceptance. *See Cea v. Hoffman,* 2012 UT App 101, ¶ 25, 276 P.3d 1178 (noting that rejecting material terms of an offer,

---

5. Our resolution of Verdi's challenge to the district court's determinations supporting the award of bad faith attorney fees eliminates the need to reach Verdi's claim that the attorney fees affidavit failed to comply with rule 73 of the Utah Rules of Civil Procedure.

6. The counteroffer notice actually says "specified in the attached ADDENDUM NO. 2." The parties agree that Addendum No. 2 was never a part of the Sellers' counteroffer and that all of the terms of the counteroffer were handwritten onto the REPC itself.

such as the purchase price, and proposing different terms is a counteroffer, not an acceptance).

¶ 19 On February 20, 2009, nine days after the date of the counteroffer, Verdi presented the Sellers with Addendum No. 3, which reiterated the counteroffer's purchase price and closing date but added additional terms. In particular, the counteroffer more specifically identified the subject property by including its full legal description and the recording information for the warranty deed that conveyed the property to the Nelsons and the Lundahls; it granted Verdi "full and complete access to the identified property for all testing and evaluation purposes"; and finally, it mandated that "due diligence and test data remain[ ] confidential and the property of the buyer." These modifications were apparently of sufficient importance to Verdi that Addendum No. 3 required the Sellers—by 5:00 p.m. the next day—"to accept the terms of this ADDENDUM in accordance with the provisions of Section 23 of the REPC," which required the Sellers to "sign [Addendum No. 3] where noted to indicate acceptance" and "communicate[ ] to [Buyer] ... that the ... counteroffer has been signed as required." This requirement, when considered in conjunction with the additional protections proposed by Verdi, makes Addendum No. 3 a counteroffer, rather than an acceptance of the Sellers' counteroffer, as Verdi now claims. *See id.* ("[N]o contract arises unless the original offeror accepts [the counteroffer] unconditionally." (citation and internal quotation marks omitted)). Addendum No. 3 also provided, "Unless so accepted, the offer as set forth in this ADDENDUM shall lapse." When the Sellers did not respond to Addendum No. 3, Verdi's counteroffer expired according to its own terms. *See* Restatement (Second) of Contracts § 36 (1981) (explaining that "[a]n offeree's power of acceptance is terminated by the non-occurrence of any condition of acceptance under the terms of the offer"). In addition, the Sellers' failure to respond amounted to a rejection of the counteroffer. *See Cea*, 2012 UT App 101, ¶ 25, 276 P.3d 1178 (noting that a failure to respond is a rejection of an offer). As a consequence, we conclude that the series of communications in February 2009 between Verdi on the one hand and Nelson and Lundahl on the other represented a series of offers and counteroffers, none of which were accepted, as required, by both Verdi and the Sellers. Thus, no contract formed between the parties as of February 2009. This conclusion is further supported by the parties' course of conduct following the Sellers' failure to respond to Addendum No. 3, namely the exchange of three more offers.

¶ 20 Three months after the Sellers failed to respond to Addendum No. 3, Verdi again offered to purchase the property under the same terms proposed in Addendum No. 3 but with a closing date and due diligence deadline in December 2009. A few days later, on May 26, 2009, Lundahl counteroffered, setting a closing and due diligence deadline in September 2009 and requiring Verdi to pay $100,000 of the $500,000 purchase price within a month of accepting the offer. That same day, Verdi responded by presenting the Sellers with Addendum No. 6. Addendum No. 6 offered to purchase the property for $500,000 and to close in September 2009 but required the return of the $8,000 earnest money. Nelson checked the acceptance box and signed his name to Addendum No. 6. Lundahl never signed. Lundahl's failure to respond by the acceptance deadline constituted a rejection: "[x] Seller [ ] Buyer shall have until *5:00* [ ] *am* [x ] *pm Mountain Time on May 28, 2009, to accept the terms of this ADDENDUM in accordance with the provisions of Section 23 of the REPC. Unless so accepted, the offer as set forth in this ADDENDUM shall lapse."* See id.* Lundahl's failure to execute Addendum No. 6 renders it unenforceable.[7] *See also* Utah Code Ann. § 25-5-3 (LexisNexis 2013) (explaining that under the Utah Statute of Frauds, "[e]very contract ... for the sale, of any lands, ... shall be void unless the contract ... is in writing subscribed by the party by whom the ... sale is to be made");

---

7. Verdi has not made a claim that Nelson's signature bound Lundahl or that Nelson had authority to authorize the sale on behalf of Lundahl. Verdi also does not claim that the REPC is separately enforceable against Nelson's interest in the property.

*Williams v. Singleton,* 723 P.2d 421, 423 (Utah 1986) (explaining that where fewer than all co-owners have signed a contract for sale of jointly-owned property, the agreement is not enforceable). Without a valid contract, Verdi's claims based on contract, constructive trust, and fraud or misrepresentation must fail, as explained below.

### A. Contract Claims

¶ 21 Verdi first asserts that summary judgment on his breach of contract and breach of the covenant of good faith and fair dealing claims was improper because the contract was enforceable under the part performance doctrine. Verdi's part performance argument arises from one of the grounds asserted by the Sellers as the basis for summary judgment: violation of the statute of frauds. Both in their motion for summary judgment and on appeal, the Sellers contended that even if there was an agreement to sell the property to Verdi, that agreement necessarily fails because the Sellers' wives had not signed the REPC or the various addenda. According to the Utah Statute of Frauds, "[e]very contract ... for the sale, of any lands, or any interest in lands, shall be void unless the contract ... is in writing subscribed by the party by whom the ... sale is to be made, or by his lawful agent thereunto authorized in writing." Utah Code Ann. § 25-5-3. There is no husband—wife exception to the rule that each owner must consent to the sale via signature on the contract or written authorization to another to bind a co-owner to the sale. *Williams,* 723 P.2d at 423. Rather, the contract must be signed by each of the owners of the property because "[o]ne joint tenant or tenant in common cannot bind his cotenant by a contract which he may make relating to the common property" without the other's express written authorization. *Id.*

¶ 22 Verdi asserts that the part performance doctrine saves the contract from the statute of frauds problem created by the wives' failure to sign the contract. The part performance doctrine is an equitable remedy fashioned "to prevent an overly rigid adherence to the statute [of frauds] from becoming the means of perpetuating a fraud." *Jenkins v. Percival,* 962 P.2d 796, 801 (Utah 1998). It generally applies when the parties have not documented their agreement in writing but one party has "partially perform[ed] its contractual obligations." *Id.* To make out a claim of part performance, "[f]irst, the oral contract and its terms must be clear and definite; second, the acts done in performance of the contract must be equally clear and definite; and third, the acts must be in reliance on the contract." *Martin v. Scholl,* 678 P.2d 274, 275 (Utah 1983) (citation and internal quotation marks omitted). According to Verdi, it entered into an unambiguous agreement with the Sellers to purchase the property and it performed on the contract in reliance on the Sellers' oral and written representations that they had full authority to sell the property.

¶ 23 Verdi's part performance argument fails. Verdi's claim that there was an agreement that was made unenforceable by the statute of frauds due to the wives' failure to sign rests on its contention that the REPC, together with Addendum No. 3 and Addendum No. 6, represented an offer-and-acceptance chain that established an agreement by the Sellers to sell the property to Verdi. Yet we have rejected Verdi's foundational contention that the Sellers agreed to sell the property, because Verdi *and the Sellers*—their wives aside—never reached the meeting of the minds necessary to form a contract for the sale and purchase of the property in the first place. *See supra* ¶ 20 & n. 7. The doctrine of part performance permits a court to enforce a contract that is otherwise unenforceable because of the failure to comply with the statute of frauds; it does not create a contract that was never in existence. *Martin,* 678 P.2d at 275. Thus, even if Verdi's performance were otherwise sufficient under part performance standards (which we do not decide),[8] it cannot overcome

---

8. For example, because we have resolved Verdi's part performance claim on the basis that there was no underlying contract implicating the statute of frauds, we need not address the question of whether Verdi's subsequent activities met the standard for part performance in reliance on the contract or were simply due diligence efforts contemplated by the REPC provision permitting

the failure of the parties to reach a meeting of the minds.

¶ 24 We therefore affirm the district court's grant of summary judgment on Verdi's breach of contract claims. *See* Utah R. Civ. P. 56(c) (explaining that summary judgment is appropriate when there are no disputed facts and "the moving party is entitled to a judgment as a matter of law").

## B. Constructive Trust Claim

■■ ¶ 25 Verdi next asserts that the district court should not have granted summary judgment on the claim that the Sellers held the property in a constructive trust for Verdi's benefit. Verdi's argument is that "[u]pon the execution of the Real Estate Purchase Contract, which occurred upon the execution of Addendum No. 6, equitable title transferred to Verdi," pending execution of a deed of conveyance at the closing when it would have received legal title as well. In support of its position, Verdi cites *C & J Industries v. Bailey*, 618 P.2d 58 (Utah 1980), for the proposition that upon the execution of a real estate contract, the "property has been sold and bought" even though "the final act necessary to bring the purpose of the contract to fruition, that is, the conveyance of legal title, is to occur in the future," rendering the contract "technically executory." *Id.* at 59. As with its part performance claim, however, Verdi's argument depends upon the formation of a valid contract of sale. And we have already concluded that no contract for the sale of the property to Verdi was ever formed. *See supra* ¶ 20 & n. 7. Without an agreement, Verdi cannot claim an ownership interest in the property, equitable or otherwise. As a result, the district court did not err in granting summary judgment on Verdi's constructive trust claim.

## C. Fraud and Negligent Misrepresentation Claims

■■ ¶ 26 Finally, Verdi argues that summary judgment was inappropriate on its fraud and negligent misrepresentation claims because there is a genuine dispute of material fact about whether Nelson and Lundahl represented to Verdi that they had full au-

the buyer to cancel the sale under certain condi-

thority to convey title to the property, including any interest that their wives might hold. *See generally Smith v. Frandsen*, 2004 UT 55, ¶¶ 10 11, 94 P.3d 919 (explaining that to prove negligent misrepresentation, which is a form of fraud, the plaintiff must show that the defendant made a false representation); *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 16, 70 P.3d 35 (explaining that in making out a claim of fraud, the plaintiff must show that the defendant made a misrepresentation of material fact). That claim fails for the same reason Verdi's contract and constructive trust claims do—the lack of a valid contract.

¶ 27 Verdi claims that Nelson and Lundahl each represented that he had full authority to convey all the rights in the undivided portion of the land in which he had an interest, including the rights of any co-owner of that portion. In other words, Nelson represented that he had authority to sell a 20% joint interest in the property and Lundahl represented that he had authority to sell an 80% joint interest, regardless of whether ownership of that interest was also shared with another, i.e., their respective wives. But Verdi's purchase of the property did not fail because of any misrepresentation by the Sellers that they had authority to bind their wives to the contract. Rather, the purchase fell through because no valid contract to sell the land to Verdi was ever formed. Had Lundahl executed Addendum No. 6 and then the purchase failed to occur because the wives refused to sign the contract, the scope of the Sellers' representations about their authority to bind their wives would be material to the dispute. But under the present facts, where no one representing Lundahl's 80% undivided interest in the property signed the final segment of the REPC–Addendum No. 3–Addendum No. 6 sequence that could have created a contract, any representation (or misrepresentation) about the Sellers' authority to bind their wives is immaterial. Accordingly, the district court properly granted summary judgment in favor of the Sellers on the fraud and negligent misrepresentation claims.

tions.

## II. Attorney Fees

¶ 28 We now turn to Verdi's claim that the district court erred in awarding bad faith attorney fees to the Sellers. The bad faith statute allows a trial court to "award reasonable attorney fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith." Utah Code Ann. § 78B–5–825(1) (LexisNexis 2012). In order for a court to award fees under the statute, it must separately address the requirements of bad faith and lack of merit. *Still Standing Stable, LLC v. Allen*, 2005 UT 46, ¶¶ 7–10, 122 P.3d 556 ("[T]he mere fact that an action is meritless does not necessarily mean that the action is also brought in bad faith." (citation and internal quotation marks omitted)); *Utah Telecomm. Open Infrastructure Agency v. Hogan*, 2013 UT App 8, ¶ 15, 294 P.3d 645 ("While the 'purpose' behind [the] action is relevant to whether [a party] acted in bad faith, it is not relevant to whether the action lacked merit.").

¶ 29 The district court provided the following explanation for the award of bad faith attorney fees:

> [T]here was clearly no contract between the parties when the action was initiated and the goal, it appears, was to stop or delay the [Sellers] from moving forward with other ventures while [Verdi] attempted to gather funds and ultimately force the [Sellers] to sell [Verdi] the property. In other words, [Verdi] used the present lawsuit to encumber the property and attempt to coerce the [Sellers] into selling it the property. Thus, [Verdi] brought this action without merit and not in good faith.

While the court seems to conclude that Verdi's claims were brought for the purpose of delay so that it could force the Sellers to sell the property to Verdi and, implicitly, without a belief in their actual merits, there does not appear to be any evidence in the record to support these findings.

¶ 30 Our supreme court has noted that the bad faith statute "is narrowly drawn. It was not meant to be applied to all prevailing parties in all civil suits." *Cady v. Johnson*, 671 P.2d 149, 151 (Utah 1983). Thus, for a district court to determine that an action was brought in bad faith, it must find that the plaintiff "(1) [lacked a]n honest belief in the propriety of the activities in question; (2) ... inten[ded] to take unconscionable advantage of others; [or] (3) [had] intent to, or knowledge of the fact that the activities in question will ... hinder, delay or defraud others." *Id.* (citation and internal quotation marks omitted). In this case, the district court found that Verdi's purpose in bringing the action was "to stop or delay the [Sellers] from moving forward with other ventures while [Verdi] attempted to gather funds and ultimately force the [Sellers] to sell [Verdi] the property."

¶ 31 We cannot ascertain the basis for the district court's finding that Verdi was acting in bad faith. *See Jeschke v. Willis*, 811 P.2d 202, 204 n. 1 (Utah Ct.App.1991) ("[W]here attorney fees are awarded pursuant to the [bad faith] statute, specific findings are required."). Although a trial court is "not require[d] ... to hold a hearing to determine if a party has exhibited bad faith," *Home Abstract & Title Co., Inc. v. American Pension Servs., Inc.*, 2012 UT App 165, ¶ 7, 282 P.3d 1015 (citation and internal quotation marks omitted), the record must support such a finding. In other words, the record must demonstrate that some evidence of Verdi's intention was presented to the court to support a finding of bad faith and that basic due process requirements were satisfied.

¶ 32 Here, as far as we have been able to determine from the record, the Sellers had mentioned bad faith on only one occasion prior to the award of bad faith fees, when they raised the concern that Verdi's complaint "was filed in bad faith" at the original hearing on the motion for summary judgment in June 2011. Specifically, the Sellers asserted that by filing a cause of action based on a contract that clearly does not exist and failing to prosecute it for two years, Verdi was employing "an intimidation tactic" intended to get the Sellers "to cave" into selling the property to Verdi. That allegation was stated in the course of argument, and the Sellers offered no specific evidence in support. Verdi did not have an opportunity

to respond to the allegation, and the district court did not make any findings of bad faith at that time.[9] Thereafter, the Sellers did not link their allegation that Verdi was acting in bad faith with a request for attorney fees or mention it in their later submission of an affidavit in support of attorney fees, which did not identify any basis for a fee award. Nor did the Sellers subsequently submit any evidence to support a claim of bad faith. Under ordinary circumstances, such shortcomings might warrant a remand for the district court to further consider whether Verdi acted in bad faith. But because we conclude that the court's without merit conclusion was in error, *see infra* ¶ 34, we instead reverse and vacate the award of attorney fees altogether.

 ¶ 33 To demonstrate that an action is "without merit," the party seeking an award of attorney fees must do more than assert that the case was unsuccessful. *Jeschke*, 811 P.2d at 203. Rather, it must persuade the court that the action "border[s] on frivolity," meaning the claims have "little weight or importance" or have "no basis in law or fact." *Cady*, 671 P.2d at 151 (internal quotation marks omitted). In other words, to support a conclusion that the action lacks merit, the district court must determine not only that Verdi's claims were unsuccessful but also that they were so deficient that Verdi could not have reasonably believed them to have a basis in law and fact. For example, Utah appellate courts have held that for purposes of the bad faith statute, an action or defense is without merit when a party misrepresented the underlying facts in order to try to make out its claim or defense, *see Valcarce v. Fitzgerald*, 961 P.2d 305, 315 (Utah 1998); *Jeschke*, 811 P.2d at 204, and when the plaintiff fraudulently altered the documents underlying the claim, *see Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 30, 61 P.3d 1009. On the other hand, we have concluded that an action that was based on a reading of a contract provision requiring confidentiality was not without merit even though the district court denied a preliminary injunction on the basis that the provision was unenforceable, which caused the plaintiff to then voluntarily dismiss the claim. *Utah Telecomm. Open Infrastructure Agency v. Hogan*, 2013 UT App 8, ¶¶ 5, 16, 294 P.3d 645.

¶ 34 In this case, the district court concluded that Verdi's claims lacked merit based on the fact that "there was clearly no contract between the parties when the action was initiated." We agree that Verdi's claims lacked merit in the conventional sense, i.e., they were unsuccessful because they depended on the existence of a contract that was never formed. We disagree, however, that the claims were so obviously unsupported by the principles of contract law or the facts of the case as to be patently groundless. The factual context of this case involved a complicated series of negotiations, offers, and counteroffers that Verdi asserts ultimately resulted in an enforceable contract. And although it became apparent by the time discovery closed and the court was presented with the second motion for summary judgment that the REPC–Addendum No. 3–Addendum No. 6 sequence did not create a contract, both the underlying facts and the law on contract formation permit a colorable argument that a contract arose.[10] The Sellers do not make much of an attempt to support a contrary conclusion. Indeed, their only argument for upholding the without merit determination is that there was "no legitimate reason for this lawsuit other than to essentially take advan-

---

9. At the original summary judgment hearing, there was no motion for bad faith attorney fees pending before the district court, and the court did not award any attorney fees, although it agreed that the lawsuit had been pending for too long. The court explained that "there are too many questions that remain unanswered" about the merits of the claim and the justification for the delays. The court granted Verdi's request for a continuance and reserved a ruling on the motion for summary judgment. The court nevertheless told counsel that "[i]f it's appropriate for the Court to impose sanctions, [it] can at the appropriate time."

10. The fact that the same district court originally granted Verdi's request for a prejudgment writ of attachment, which requires a showing that there is a "substantial likelihood ... [of] prevail[ing] on the merits of the underlying claim[s]," *see* Utah R. Civ. P. 64A(c)(3), is further indication that Verdi's claims had some colorable basis in law and fact.

tage of the Sellers and attempt to hinder, delay, or defraud them." Verdi's purpose, however, "is not relevant to whether the action lacked merit." *See id.* ¶ 15.

¶ 35 For these reasons, we conclude that Verdi's claims were not "without merit" as the term is used in the bad faith statute. Accordingly, the grant of bad faith attorney fees must be reversed. *See id.* ¶ 18 (noting that an action must both lack merit and be asserted in bad faith to warrant an award of attorney fees under the bad faith statute). *See generally Cady v. Johnson*, 671 P.2d 149, 151 (Utah 1983) (noting that because the bad faith statute is "narrowly drawn," "[i]t was not meant to be applied to all prevailing parties in all civil suits").

## CONCLUSION

¶ 36 Summary judgment for the Sellers was appropriate on all of Verdi's claims because the parties never formed a contract. We reverse and vacate the award of attorney fees under the bad faith statute, however, because Verdi's claims were not without merit as required for such an award. We deny the Sellers' request for attorney fees on appeal because they neither received attorney fees in the district court nor prevailed on appeal.