[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14019

_____

D.C. Docket No. 1:16-cv-02867-LMM-RGV

CARTER MASON,
ANITA BURNETT,

Plaintiffs - Appellees,

versus

MIDLAND FUNDING LLC,
ENCORE CAPITAL GROUP, INC.,
MIDLAND CREDIT MANAGEMENT, INC.,
COOLING & WINTER, LLC,
ASSET ACCEPTANCE CAPITAL CORP.,
ASSET ACCEPTANCE, LLC,
FREDERICK J. HANNA,
JOSEPH C. COOLING,
ROBERT A. WINTER,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 13, 2020)

Before ED CARNES, Chief Judge, and ROSENBAUM, Circuit Judge, and VINSON,* District Judge.

PER CURIAM:

As we all know from experience, companies often enclose contracts and terms of use inside the packaging of products we buy at the store. Courts have generally approved the use of these so-called "shrink wrap" agreements because they put consumers on notice that by using the product, they are agreeing to certain contractual terms.

The age of the internet has brought with it the modern corollary of the shrink wrap agreement, the clickwrap agreement—an agreement that a consumer using the seller's website must review and accept before making an online purchase. Courts have also largely approved the use of clickwrap agreements for the same basic reason that they have approved the use of shrink wrap agreements: the consumer is on notice that an agreement exists and receives the opportunity to review the terms of that agreement and to consent.

But of course, courts' acceptance of these types of agreements contemplates that the promoters of the clickwrap agreement can demonstrate that the alleged acceptor, in fact, either digitally or by paper, received a copy of the agreement at

---

* Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

2

issue.    In this case, whether the plaintiffs did, in fact, receive a copy of the agreements the defendants seek to hold them to is what's at issue.

Here, the defendants[1] seek to hold Plaintiffs Carter Mason and Anita Burnett (formerly Anita Pfister) to arbitration agreements that the defendants claim Mason and Burnett agreed to when they obtained credit accounts online.  After careful consideration, we conclude that the defendants have made a satisfactory showing that Burnett received and agreed to the arbitration agreement.  But the defendants' evidence does not establish that Mason ever received or knew of the arbitration agreement.  For that reason, we affirm the district court's denial of the defendants' motion to compel arbitration as it relates to Mason, but we reverse as it regards Burnett.

## I.

On August 11, 2013, Mason applied online for a Fingerhut-branded credit-card account originated by WebBank.  Blue Stem Brands, Inc., acted as the servicer and custodian of records for that account.

The defendants claim that as part of opening that account, Mason became subject to a card agreement that requires him to arbitrate any dispute arising out of the agreement or credit relationship (the "Mason Card Agreement").  That is so,

---

[1] The defendants are Encore, four of its wholly owned subsidiaries, a law firm, Cooling and Winter LLC, and three attorneys.

according to defendants, because the online application through which Mason applied for the card allegedly required him to accept terms and conditions that contained an arbitration agreement. And then, defendants assert, Mason was mailed a Welcome Packet containing the Mason Card Agreement, along with the credit card. After Mason received the credit card, he used it.

When Mason failed to make any payments due on the account, the then-owner of the debt filed a statement of claim against Mason. Mason filed his answer, and the suit was voluntarily dismissed.

Burnett's story is similar. Burnett opened a CareCredit account with GE Money Bank (now known as Synchrony Bank) on April 2, 2008. As with Mason, just under ten days later, Synchrony purportedly mailed Burnett a credit card for the account and a card agreement (the "Burnett Card Agreement"). Also as alleged to be the case with Mason, that card agreement supposedly contained an arbitration provision that, if binding, required Burnett to arbitrate all claims related to the credit relationship. Burnett then used the card and allegedly did not pay off the balance. So the then-owner of Burnett's purported debt sued to collect the unpaid account balance but never served the lawsuit on Burnett.

Mason and Burnett teamed up to file the Second Amended Complaint (the "complaint") in the present suit.[2]  The complaint alleges that Encore purchases "vast amounts of consumer debt" that is "unsupported by evidence" and often "uncollectable."  It further asserts that Encore's attorneys then "file scattershot consumer debt collection lawsuits in state courts . . . to mislead consumers into believing that Encore [ ] actually has admissible evidence, and that it intends to take its claims to trial."  Plaintiffs contend that these practices violate federal law, including the Fair Debt Collection Practices Act.

In response to the complaint, the defendants moved to dismiss.  The district court denied the defendants' motion as it related to Mason and Burnett.  So the defendants moved to compel arbitration.  The district court denied those motions too, holding that the defendants failed to produce competent evidence that Burnett and Mason had agreed to arbitrate.

The defendants then filed this interlocutory appeal,[3] which turns on whether they have shown, with evidence, that Mason and Burnett agreed to arbitrate.  If so, then we must reverse.  If not, then we affirm.

---

[2] The district court dismissed the claims of three other plaintiffs named in the complaint. Those plaintiffs are not parties to this appeal.

[3] We ordinarily have jurisdiction over only "final decisions" of district courts.  *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 627 (2009).  But there are some exceptions to that rule. Section 16 of the Federal Arbitration Act provides one for certain interlocutory appeals.  *Id.*  As relevant here, it permits an interlocutory appeal from a district-court order "denying a petition under section 4 of this title to order arbitration to proceed."  9 U.S.C. § 16(a)(1)(B); *see also Bess*

## II.

If an arbitration agreement applies in this dispute, it is governed by the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 *et seq.*, which "embodies a liberal federal policy favoring arbitration agreements." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (internal quotation marks omitted). The FAA creates a "presumption of arbitrability," and under it, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115 (11th Cir. 2014).

Nevertheless, "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Dasher*, 745 F.3d at 1116. Rather, the threshold question of whether an arbitration agreement exists at all is "simply a matter of contract." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). In the absence of an agreement, "a court cannot compel the parties to settle their dispute in an arbitral forum." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004).

State law governs whether an enforceable contract or agreement to arbitrate exists. *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir.

---

*v. Check Express*, 294 F.3d 1298, 1302 (11th Cir. 2002) (reviewing at interlocutory stage a district court's order denying a motion to compel arbitration).

6

2016).  So we look to ordinary state-law principles governing contract formation. *Id.* at 1329-30.  Here, the parties agree that we should apply Utah's law of contract formation.

Under Utah law, an enforceable "contract requires an offer, an acceptance, and consideration." *Cea v. Hoffman*, 276 P.3d 1178, 1185 (Utah Ct. App. 2012).  In addition, Utah Code § 25-5-4(2)(e) is applicable here and provides that a credit agreement is "enforceable without any signature as long as the 'debtor is provided with a written copy of the terms of the agreement,' the agreement states that 'any use of the credit offered shall constitute acceptance of those terms,' and the debtor 'uses the credit offered.'" *Am. Express Bank FSB v. Tanne*, 412 P.3d 282, 283 (Utah Ct. App. 2017) (quoting Utah Code Ann. § 25-5-4(2)(e)).  The party attempting to enforce the contract "has the burden of showing that an offer and acceptance were more probable than not." *Cea*, 276 P.3d at 1186.

There is no dispute that Mason and Burnett made charges to their credit accounts or that the Mason and Burnett Card Agreements provided that use of the cards would constitute acceptance of the terms of the agreements.  So we consider only whether the defendants show that it's more probable than not that Mason and Burnett were provided with a written copy of the arbitration agreement.

The district court held that the defendants had not met that burden, so it denied their motions to compel arbitration. We review that denial *de novo*. *Bazemore*, 827 F.3d at 1328.

## III.

### A.    Mason

The defendants contend that Mason can be compelled to arbitrate because (1) he accepted the terms of a clickwrap agreement that was a part of his online credit application, and (2) the Mason Card Agreement was mailed to Mason after he opened his account. We are unpersuaded by those arguments because the defendants failed to connect the dots, *with evidence*, between Mason and an agreement to arbitrate. To show why that is so, below, we separately discuss the evidence as it pertains to the clickwrap agreement and to the alleged mailing of the Mason Card Agreement. Then we address the defendants' alternative argument that if they failed to show on the papers that they are entitled to compel arbitration, they should receive the opportunity to prove their contention in a trial.

### 1.    The Clickwrap Agreement

The defendants contend that Mason agreed to arbitrate by assenting to a clickwrap agreement that was a part of his online application. In support of this argument, the defendants cite a single source of evidence: the declaration of Richard

Winship, the Senior Vice President, Credit Operations and Collections Management for Bluestem Brands, Inc.

Winship attached to his declaration a "true and correct copy of a template application for a Fingerhut Credit Account issued by WebBank, *in a substantially similar form* to the application that existed on August 11, 2013, on the Fingerhut website." (emphasis added). According to Winship, "[t]he entire terms and conditions were contained on the same page as the application form," and "Mason could not have opened a credit account on the Fingerhut website unless he clicked 'Yes! I accept these terms.'" But a close review of Winship's declaration and its attachment reveals that they don't establish that Mason agreed to arbitrate when he completed Fingerhut's online application.

First, we do not know what terms Mason actually saw on August 11, 2013, when he viewed the website. The exhibit attached to the declaration, as Winship admits, shows the application in only a "substantially similar form." In *Bazemore*, we faced a materially indistinguishable situation and concluded that an attachment that was "*a form* of the Cardholder Agreement that would have been sent to [the] Plaintiff" was not sufficient to show what terms the plaintiff had actually seen and agreed to. *See* 827 F.3d at 1331 (alteration and emphasis adopted). Though here a "substantially similar" online application is at issue—rather than a substantially similar cardholder agreement—that makes little difference because the defendants

9

contend that that online application and its terms and conditions somewhere contained the arbitration provision. But we can't know that without evidence about exactly what application Mason was actually looking at when he signed up for his credit account.

Second, and more important, even if we were to assume that the "substantially similar" online application was materially identical to the application Mason actually filled out, we still lack any evidence showing that the online application or its terms and conditions contained an arbitration provision. As we have noted, Winship stated that "[t]he entire terms and conditions were contained on the same page as the application form." But the attached application displays just two paragraphs of terms and conditions. Even assuming that those made up the "entire" terms and conditions, they still say nothing about arbitration. Instead, they detail "two types of financing provided by WebBank to pay for [ ] Fingerhut purchases." If additional terms existed, we have no way to know what they were. Finally, though "Terms & Conditions" appears to be a hyperlink, we have no information about the contents of the linked page, and those terms are certainly not "on the same page as the application form." So that, too, fails to move the needle.

Of course, the Mason Card Agreement, also attached to the Winship declaration, contains an arbitration provision. But Winship never stated that the website ever displayed *that* agreement—as opposed to the application and its terms

10

and conditions—to Mason during his online application. Nor did Winship state that the Mason Card Agreement was the "terms and conditions." And Winship never explained the relationship, if any, between the Mason Card Agreement and the online application's terms and conditions. Nor can we infer a relationship from anything in Winship's declaration. In fact, Winship's declaration renders the inference implausible because, according to Winship, "[t]he entire terms and conditions were contained on the same page as the [substantially similar] application form." But, as we have discussed, the Mason Card Agreement, with its included arbitration provision, is not one of those terms.

In short, the record evidence neither shows the actual application form that Mason filled out and agreed to online nor demonstrates that that online application contained an arbitration provision. Those evidentiary gaps mean the defendants failed to prove that it's more probable than not that Mason was provided with a copy of the terms of the arbitration agreement via the online application. *See Bazemore*, 827 F.3d at 1331 ("[Defendant] did not meet its burden of proving that plaintiff assented to the 'essential terms of the contract' for the simple reason that the terms of exactly what, if anything, [plaintiff] agreed to when she applied for the credit card are unknown.").[4]

---

[4] Because we conclude that defendants have not shown Mason ever agreed to arbitrate, we need not reach the question of whether Utah law condones the use of clickwrap agreements.

### 2.     The Purported Mailing of the Mason Card Agreement

Next, the defendants argue that they mailed Mason the Mason Card Agreement, so by way of the mailbox rule, they have established that Mason received the agreement and therefore agreed to arbitrate. But this argument also lacks the necessary evidentiary support.

"The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee." *Bazemore*, 827 F.3d at 1331 n.2 (alteration adopted). A party may take advantage of the mailbox rule's presumption by showing that "(1) the document was properly addressed; (2) the document was stamped; and (3) the document was mailed." *In re E. Coast Brokers & Packers, Inc.*, 961 F.2d 1543, 1545 (11th Cir. 1992).

A party may establish these requisites in two different ways. First, it may present evidence, based on *personal knowledge*, that the document was in fact placed in the mail. *Bazemore*, 827 F.3d at 1331. Second and alternatively, a party may invoke the mailbox rule based on "[t]estimony concerning specific office procedures for preparing and mailing notices in addition to evidence of mail received from the purported sender at the same address (and by other designated recipients in the normal course)[.]" *Kerr v. McDonald's Corp.*, 427 F.3d 947, 952 (11th Cir. 2005); *see also E. Coast Brokers & Packers*, 961 F.2d at 1545-46. But that too requires more than "unsupported conclusory assertions of an individual based on his

12

assumption of how mail was handled in the normal course of business[.]" *E. Coast Brokers & Packers*, 961 F.2d at 1545.[5]

Once again, the facts here are materially indistinguishable from our recent decision in *Bazemore*. There, like here, the defendants relied on a single declarant to provide evidence that they hoped would trigger the mailbox rule's presumption of receipt. We explained that the submitted evidence was insufficient because testimony that "a Cardholder agreement with an arbitration clause '*would have been sent* to [p]laintiff'" did not trigger the mailbox rule since it did not reflect "personal knowledge that [the agreement] in fact was sent" to the plaintiff. *Bazemore*, 827 F.3d at 1331. We also noted that the declarant had failed to claim that he reviewed records showing the agreement had been mailed. *Id.* For that reason, we held that the defendant could not compel the *Bazemore* plaintiff to arbitrate. *Id.* at 1330-32.

So too here. The Winship declaration fails to show that Winship has personal knowledge that the Mason Card Agreement was in fact placed in the mail. True, Winship stated, "Bluestem, as part of its regular and routine business practice, transmitted information from Mason's application to its print vendor, Impact, in connection with Bluestem's order for printing and mailing of the Welcome

---

[5] The parties dispute whether we should apply Utah's mailbox rule, which purportedly imposes a stricter evidentiary standard than the federal mailbox rule. *See McCoy v. Blue Cross & Blue Shield of Utah*, 20 P.3d 901, 903-905 (Utah 2001) (setting forth a "direct and specific" evidence rule). Because we would reach the same conclusion under either standard, we decline to opine on whether Utah's mailbox rule applies.

Packet[,]" which supposedly contained the Mason Card Agreement. Winship also attached true and correct copies "of an excerpt of the data file, sent to Impact on August 12, 2013," and a "template that Bluestem used for Welcome Packets . . . in August 2013[.]"[6] No problems there. Winship, who works for Bluestem, set forth foundation supporting his claim to personal knowledge about those facts and events.

But Winship didn't complete the purported mailing *to Mason*. The mailing was, as Winship explains, completed by two third-parties, Impact and Pitney Bowes: "Impact, in turn, used Pitney Bowes to commingle and sort Welcome Packets with other bulk mail to optimize postal discounts and then to deposit with the United States Postal Service for delivery to Mason[.]" Like in *Bazemore,* nothing in the record suggests that Winship has personal knowledge about whether Impact and Pitney Bowes actually mailed the Welcome Packet intended for Mason. How could he? He didn't work for either of the third parties that supposedly completed the mailing. And like in *Bazemore*, Winship never attested that he reviewed any of Impact's or Pitney Bowes's records showing that the Welcome Packet was in fact sent to Mason.

---

[6] Winship stated that Exhibit D, the excerpt of the data file, was "sent to Impact, on August 12, 2013. It reflects that Bluestem sent the Welcome [sic] mailed Mason a Welcome Packet to Mason at . . . the address Mason provided when he applied for the Account." That of course can't be true. That a data file was sent to Impact does not "reflect" that the Welcome Packet was mailed to Mason. It "reflects" Bluestem's request for Impact to do so.

14

Nor did Winship attest about the "specific office procedures" that supposedly resulted in a mailing, so the defendants cannot take advantage of the *Kerr* rule. That's unsurprising. Winship was twice removed from the Pitney Bowes office where the preparation and mailing actually occurred. Thus, Winship's conclusory assertion about the result of those companies' purported process is insufficient to show that Mason was mailed the Mason Card Agreement and its arbitration provision.

At the end of the day, the defendants, who rely solely on the Winship declaration to show that the Mason Card Agreement was placed in the mail, fail to present any "competent evidence" establishing that occurred. For that reason, the mailbox presumption does not apply. Because nothing else indicates that Mason received the Mason Card Agreement, or otherwise agreed to arbitrate, the defendants have not met their burden to show Mason is subject to an arbitration agreement. So we conclude that the district court correctly denied the defendants' motion to compel as it related to Mason.

### 3.    Section 4 of the Federal Arbitration Act

Finally, as this appeal regards Mason, the defendants argue in the alternative that should we determine that they failed to prove the existence of an agreement to arbitrate with Mason, we should order the district court to hold a trial on the issue. That argument relies on Section 4 of the FAA, which provides that "[i]f the making

15

of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."  9 U.S.C. § 4.

As an initial matter, we note that the defendants did not request a trial under § 4 of the FAA in the district court.  So we can decline to address the issue in the first instance.  *See San Francisco Residence Club, Inc. v. 7027 Old Madison Pike, LLC*, 583 F.3d 750, 755 (11th Cir. 2009) (declining to address request for relief made for the first time on appeal because the district court did not "have the opportunity to pass upon the issue").

But even if we chose to consider the merits of the defendants' § 4-argument, we would conclude that the defendants are not entitled to a trial on the issue of whether Mason agreed to arbitrate.  Section 4 does not require the district court to hold a trial on the issue of whether an arbitration agreement exists any time a party asks for it.  Instead, "a summary judgment-like standard is appropriate[.]" *Bazemore*, 827 F.3d at 1333.  So "a district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if there is no 'genuine dispute as to any material fact' concerning the formation of such an agreement." *Id.* (quoting Fed. R. Civ. P. 56(a)).  Neither conclusory allegations nor merely colorable and not significantly probative evidence satisfies that standard. *Id.*

16

And of course, we do not require a trial based on supposed "disputes" of material fact unsupported by any evidence at all. *See id.*

*Bazemore* again guides our analysis. Like in *Bazemore*, the "competent evidence offered by [the defendants here] is insufficient to raise a genuine issue of fact as to the existence of an arbitration agreement[.]" *Id.* As we have explained, the defendants "provide[ ] no competent evidence that an arbitration agreement ever was sent to plaintiff." *Id.* As a result, there cannot be a genuine dispute about whether an arbitration agreement existed that would require a trial to resolve. *See id.*

*Bazemore* also found no material dispute of fact because the defendant there had provided only "'a form' of the arbitration agreement"—as opposed to the actual arbitration agreement—that was supposedly sent to the plaintiff. *Id.* at 1333-34. That is also the case here with respect to the online application Mason completed. As we have explained, though the defendants may have presented competent evidence that Mason agreed to certain terms and conditions when completing the online application, they submitted no evidence that those terms and conditions (or anything else available through the online application) contained an arbitration agreement. Only competent evidence about Mason's agreement to arbitrate—and not his agreement as to anything else—can create a genuine dispute of material fact entitling the defendants to a trial under § 4 of the FAA. The defendants have offered

17

no such evidence here, so their motion to compel arbitration must be denied as a matter of law without the need for a trial.

## B.    Burnett

For Burnett, the defendants pin all their hopes on the purported mailing of the Burnett Card Agreement.  Like with Mason, the defendants' argument depends on whether their evidence shows that the mailbox rule's presumption of receipt was triggered.  So as with Mason, the defendants were required to present evidence based on personal knowledge that the Burnett Card Agreement was in fact placed in the mail.  And also as with Mason, the defendants' attempt to do so depends on a single declaration, this time from Angel Nayman.  Here, though, the similarities with Mason's case end.  Unlike with Mason, the defendants have provided enough evidence to trigger the mailbox rule's presumption as it pertains to Burnett.  And because Burnett does not attempt to rebut that presumption, we reverse the district court's denial of the defendants' motion to compel with respect to Burnett.

Nayman, a Lead Litigation Analyst for Synchrony, attested that "Synchrony's records show that the credit card for the [Burnett] Account was mailed to Anita [Burnett] at the address on record . . . on or about April 11, 2008[,] via the United States Postal Service First Class Mail."  "Enclosed with the credit card was a copy of the effective credit card account agreement," i.e., the Burnett Card Agreement, "that governs the Account."  Nayman claimed that those facts fell "within [her]

personal knowledge" and were "based upon [her] review of relevant business records of Synchrony."

So Nayman's declaration checked all the boxes that the Winship declaration and the declaration at issue in *Bazemore* left incomplete. Nayman attested that she had personal knowledge of the mailing and that claim, unlike Winship's claim, was properly supported because Nayman was not testifying about third-party conduct. And unlike the declarant in *Bazemore*, Nayman stated that her personal knowledge was based upon review of her own employer's records, which she "regularly access[ed] and review[ed]" as part of her employment responsibilities. The sum total of Nayman's testimony therefore constitutes competent evidence that the Burnett Card Agreement was placed in the mail.

We are not persuaded by Burnett's arguments to the contrary. First, Burnett contends that Nayman's declaration provided no basis for her purported knowledge of the mailing and did not detail the documents she reviewed nor attach any documents supporting her claim. We are unpersuaded.

Burnett articulates no good reason why we should ignore the foundation Nayman's own declaration provides. Again, the situation here differs significantly from that with Winship. Winship purported to claim personal knowledge about the inner workings of two companies that he did not work for. Nayman, on the other hand, testified based on her own personal knowledge to only facts about the goings-

19

on within the company she worked for. She also laid a proper foundation to support the statement that she possessed personal knowledge of the relevant matters. Finally, Nayman further supported her basis of knowledge by asserting that she also relied on her review of her company's documents.

Second, Burnett argues, citing the district court's order, that Nayman did not describe Synchrony's mailing procedure. That argument misses the point. Though describing a company's mailing procedure is one way to trigger the mailbox presumption, it is not the only way. An equally effective way is to submit evidence showing that the Burnett Card Agreement was placed in the mail. Nayman's declaration did just that.

For those reasons, the defendants' evidence was sufficient to trigger the mailbox rule's presumption that Burnett received the Burnett Card Agreement, including the arbitration agreement contained within it. Burnett has not submitted any evidence of her own rebutting that presumption and does not otherwise argue that the defendants have failed in satisfying their burden with respect to any of Utah Code § 25-5-4(2)(e)'s other requirements. So the defendants met their burden to show an enforceable arbitration agreement exists. For that reason, we must conclude that the district court incorrectly denied the defendants' motion to compel Burnett to arbitrate her disputes.

## IV.

For the reasons we have explained, we affirm the district court's denial of the defendants' motion to compel arbitration as it relates to Mason, and we reverse it as it pertains to Burnett.  We therefore remand this case to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**