2024 UT App 35

## THE UTAH COURT OF APPEALS

UTAH ASSOCIATED MUNICIPAL POWER SYSTEMS,
Appellee,
*v.*
3 DIMENSIONAL CONTRACTORS INC.
AND BENZER DEVELOPMENT SOLUTIONS LLC,
Appellants.

Opinion
No. 20210935-CA
Filed March 21, 2024

Fifth District Court, St. George Department
The Honorable Eric A. Ludlow
No. 180500577

Lewis P. Reece and Devon J. Herrmann,
Attorneys for Appellants

James K. Tracy, J. Jacob Gorringe, and Hyrum J.
Bosserman, Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1 During development of a residential subdivision, the city and the developers each made a critical mistake: the city platted a public street directly on top of existing structures, including a support pole, erected by Utah Associated Municipal Power Systems (UAMPS), and the developers (3 Dimensional Contractors, Inc. and Benzer Development Solutions, LLC (collectively, Benzer)) constructed a house partially inside the boundaries of UAMPS's easement for support pole guy wires. After efforts to solve the problems failed, UAMPS and Benzer sued each other, with Benzer seeking (among other things) an order requiring UAMPS to remove the support pole from the

roadway, and UAMPS seeking (among other things) an order requiring Benzer to remove the house from its easement. In one of its claims, Benzer invoked a Utah statute that it claimed gave it the right to realign the easement, at its expense, and thereby relocate the guy wires away from the encroaching house.

¶2      While the litigation was ongoing, UAMPS voluntarily removed the support pole from the roadway. But the dispute over the house remained, and boiled down to whether Benzer had the statutory right to realign the easement. Eventually, in a series of rulings, the district court dismissed Benzer's realignment claim, concluding that Benzer had the burden of demonstrating the feasibility of realignment and that Benzer could not meet that burden because the court excluded its expert witnesses from testifying. After dismissing Benzer's realignment claim, the court entered judgment in UAMPS's favor on its affirmative claims, and it ordered Benzer to "remove" from UAMPS's easement "any portions of" the house "that currently encroach on" the easement.

¶3      Benzer now appeals, challenging (among other things) the court's interpretation of the relevant statute and its decision to exclude Benzer's experts. We agree with the court's interpretation of the statute, but we agree with Benzer that the court erroneously excluded Benzer's experts. We therefore reverse the court's ruling on that point, vacate in part the court's dismissal of Benzer's counterclaim, and remand the case for further proceedings.

BACKGROUND

¶4      UAMPS is "a full-service interlocal agency" that was created to provide "comprehensive wholesale electric energy services, on a non-profit basis, to community-owned power systems throughout the Intermountain West." *See UAMPS Smart Energy*, www.uamps.com [https://perma.cc/B9PM-B5SC]. UAMPS is a political subdivision of the state of Utah whose individual members are all public agencies, mostly cities and

towns but also water conservancy districts, utility districts, and other similar entities. *See UAMPS Members*, UAMPS, www.uamps.com/members [https://perma.cc/3BWG-B7JW]; *see also Utah Associated Mun. Power Sys. v. Public Service Comm'n of Utah*, 789 P.2d 298, 299 (Utah 1990) ("UAMPS is comprised of cities, towns, and local public agencies . . . whose aim is to construct [electric energy] generating and transmission facilities for their mutual use.").

¶5 As relevant here, UAMPS has, since 1996, possessed "an express right-of-way easement in perpetuity over certain real property in Washington County, Utah" (the Easement). UAMPS obtained the Easement by condemning the affected property rights through exercise of its eminent domain authority. Thereafter, UAMPS installed various electric-energy-related structures on the Easement, including the structures at issue in this case. In recent years, Benzer—a real estate development group—has been engaged in residential development in Washington County, and the Easement runs through one of Benzer's projects known as "Zion's Gate Estates."

¶6 Under the terms of the Easement, UAMPS—as the dominant estate holder—is allowed to construct, operate, and place within the Easement "electric systems" and "communication systems" along with equipment "necessary and/or convenient for such operations." The Easement generally allows Benzer—as the servient estate holder—"the right to fully use the surface of" the Easement as long as Benzer's use "does not interfere with" UAMPS's use, but the Easement contains one crucial specific limitation on Benzer's use: Benzer may not "erect[] buildings and/or structures within" the Easement. Indeed, the Easement grants UAMPS authority to "clear the [E]asement of all structure[s], obstructions, and/or other objects" to the extent that those structures "interfere with or threaten to endanger the operation or maintenance of" UAMPS's systems.

*Construction at Zion's Gate Estates*

¶7     In or about 2017, the Zion's Gate Estates subdivision was platted by Hurricane City. A mistake was apparently made during the platting process, because the plat map dedicated a public street right on top of certain UAMPS structures; as relevant here, the plat map showed a UAMPS support pole (the Guy Pole) located right in the middle of a street. Later, UAMPS and Hurricane City discovered the problem and began discussing ways to solve it.

¶8     In the meantime, in the summer of 2018 Benzer began construction of a house on Lot 55 of the Zion's Gate Estates development. A portion of Lot 55 is subject to the Easement, and UAMPS had already placed guy wires[1] there that were used to support a nearby power pole. These guy wires are obvious and visible to any observer, and Benzer was fully aware of their existence prior to beginning any construction on Lot 55. At the time, documents setting forth the scope of the Easement (the Easement Documents) were on file with the Washington County Recorder's Office, although Benzer apparently did not obtain a copy of the Easement Documents prior to starting construction. However, Benzer had received—prior to starting construction—a title insurance commitment that identified the Easement and indicated that UAMPS had the right to construct, operate, and maintain equipment that may run "over, under and across a portion of" Lot 55.

---

1. A "guy wire" is "a tensioned cable designed to add stability to a free-standing structure" and can "be found supporting radio masts, wind turbines," and "utility poles." *Anchor Products Guide to Guy Wires*, Anchor Products, https://www.anchorp.com/anchor-products-guide-to-guy-wires [https://perma.cc/S2PY-G5NJ].

¶9    Notwithstanding the visible guy wires and its knowledge of the existence of the Easement, Benzer elected to proceed with construction of a house on Lot 55 that encroaches on the boundaries of the Easement; one exterior wall of the house is located only inches from the guy wires. This positioning of the house was apparently strategic on Benzer's part, because it allowed for the inclusion of an additional parking stall on the side of the lot opposite from the guy wires, a factor Benzer thought would make the lot more desirable for potential buyers.

¶10    Not long after Benzer began construction on Lot 55, an employee of the Hurricane City power department drove through Zion's Gate Estates and noticed that the house being constructed on Lot 55 was in extremely close proximity to the UAMPS guy wires. Fearing that this might interfere with the Easement, a different Hurricane City employee (Employee) called Benzer's manager (Manager) to discuss the issue. In response, Benzer temporarily halted construction on Lot 55. Over the next few weeks, a series of communications ensued, and in one message, Employee told Manager that, as he understood the matter, UAMPS was having difficulty locating an actual copy of the Easement Documents and therefore UAMPS was not, at that time, making any attempt to force Benzer to halt construction. But Employee indicated that UAMPS personnel would be meeting soon to discuss the issue and decide how UAMPS wished to proceed. Benzer did not wait to hear what UAMPS had decided and, without further ado, recommended construction of the house on Lot 55, making no adjustments to its positioning.

¶11    In September 2018, UAMPS sent Benzer a demand letter, telling Benzer that it was indeed encroaching on the Easement and demanding that Benzer either (a) move the house on Lot 55 or (b) pay to have the existing power pole and guy wires replaced "with a standalone pole without a guy wire." UAMPS estimated that installing a standalone pole would cost approximately $105,500, not including labor. Following receipt of the letter,

Benzer did not agree to either option: it refused to move the house, and it refused to pay the costs of installing a standalone pole. Instead, Benzer continued with its development plans and proceeded to complete construction of the house on Lot 55.

*The Litigation*

¶12    Some months later, in December 2018, UAMPS initiated this lawsuit by suing Benzer.[2] Its chief requests were for a judicial declaration that Benzer was violating the Easement and for an injunction commanding Benzer to remove or re-situate the house on Lot 55 so that it would no longer encroach on the Easement. UAMPS also asserted trespass and nuisance claims against Benzer and, in connection with those claims, sought as alternative remedies both an injunction and damages.

¶13    Benzer answered UAMPS's complaint, and included several affirmative defenses, including an assertion that it had "the affirmative right to realign" UAMPS's "guy wire easement" pursuant to a Utah statute (the Realignment Statute). *See* Utah Code § 10-8-14.5. Later, Benzer amended its answer to include a counterclaim, which in its first iteration included damages claims for trespass and civil conspiracy but, as later amended, included only two non-damages claims against UAMPS. First, Benzer complained about the Guy Pole being located in the middle of a platted public street, and it asked for declaratory and injunctive relief requiring UAMPS to move the Guy Pole. Second, Benzer

---

2. This lawsuit is not the only suit between these parties regarding this specific dispute; we are aware of at least two others. *See 3 Dimensional Contractors, Inc. v. Utah Ass'n of Mun. Power Sys.*, No. 4:22-CV-00045, 2023 WL 6318120 (D. Utah Sept. 28, 2023); *3 Dimensional Contractors, Inc. v. Utah Associated Mun. Power Sys.*, No. 200500230 (Utah 5th Dist. Ct.). As we understand it, both of those other cases have been dismissed and neither one has any direct bearing on the issues presented in this appeal.

invoked the Realignment Statute and asked the court to allow it to "realign the easements to the north and to the west of" the UAMPS power pole.

¶14   Some months later, UAMPS filed a motion for partial summary judgment asking the court for an order stating that Benzer's construction of the house on Lot 55 was a "per se unreasonable intrusion" on the Easement. Benzer opposed UAMPS's motion and, in addition, filed a cross-motion of its own, seeking summary judgment in its favor on UAMPS's trespass claim and its own realignment counterclaim. After briefing and oral argument, the district court issued a ruling granting UAMPS's motion regarding its own easement-interference claim, concluding that, as a matter of law, the house built on Lot 55 "violate[s] the express terms of the Easement" and "unreasonably interferes with UAMPS's rights to the Easement." In that same vein, the court denied Benzer's request for summary dismissal of UAMPS's trespass claim, concluding that the facts "readily demonstrate" that the house on Lot 55 "constitutes a continuing and permanent trespass."

¶15   In the same order, the court also denied Benzer's motion for summary judgment on its realignment counterclaim, concluding that Benzer "failed to provide any evidence (through affidavit or otherwise) that realignment of the Easement . . . would not violate engineering or safety requirements." And in the absence of such evidence, the court concluded it could not "as a matter of law" hold that Benzer was "entitled to realignment." Because Benzer had been the movant on the summary judgment motion concerning its realignment counterclaim, the upshot of the court's ruling, at this time, was not dismissal of the claim but, instead, simply a ruling that Benzer was not entitled to judgment as a matter of law in its favor on that claim.

¶16   Thereafter, while the parties were engaged in the discovery process, UAMPS voluntarily moved the Guy Pole from the

middle of the platted roadway. Benzer has no issue with the new placement of the Guy Pole. However, Benzer maintains on appeal that this move might only be "temporary," and it claims that there is still some risk that UAMPS will decide to "move the pole back into the road."

¶17    After the conclusion of fact discovery, UAMPS filed a motion for summary judgment asking the court to dismiss Benzer's entire counterclaim, and both sides timely disclosed potential expert witnesses. As relevant here, Benzer disclosed that it would seek to offer expert testimony from a civil engineer (Engineer) and a land surveyor (Surveyor) in support of its realignment counterclaim. UAMPS elected to receive written reports from these experts instead of opting to take their depositions. A few weeks later, Benzer produced the reports, and they were not exactly what UAMPS had been expecting. Engineer's report took the form of a one-and-a-half-page letter wherein he opined that the guy wire problem on Lot 55 could be resolved in one of two ways: (1) by replacing the existing power pole with a self-supporting pole, an option he thought would cost about $180,000, or (2) by moving the existing guy wires from their present location to a different location "in the rear of [L]ot 54," the lot next to Lot 55, a move he believed would cost only about $15,000 and could be done in keeping with "all design and easement standards," as shown by UAMPS's recent voluntary relocation of the nearby Guy Pole. Engineer's report did not contain a specific suggestion as to *where* on Lot 54 the guy wires could be moved, but Surveyor's submission included—in fact, it contained nothing other than—two drawings, each depicting a different possible location for the guy wires on Lot 54. While neither expert's submission expressly referenced the other's, they were disclosed simultaneously, and Engineer's report mentions an "Exhibit," a presumed reference to Surveyor's drawings.

¶18    UAMPS retained an expert of its own to weigh in on realignment issues. That expert criticized Engineer and Surveyor

for not including enough information in their reports, and he opined that, due to "the lack of information" in Benzer's experts' submissions, "it is not possible to analyze" their conclusions regarding relocation of the guy wires "at anything but a superficial, theoretical level." Benzer responded to this criticism by submitting a "rebuttal" report from Engineer, this time providing additional information and analysis. At oral argument before this court, UAMPS acknowledged that Engineer's rebuttal report contains all the information the rules require and all the information necessary to allow an informed response.

¶19 Some weeks after receiving Engineer's rebuttal report, UAMPS filed motions asking the court to exclude Engineer and Surveyor from testifying as experts "at any hearing or trial in this matter." UAMPS argued that the original submissions from Engineer and Surveyor were "woefully deficient" and left UAMPS with "literally no idea what" the experts planned to testify about. After briefing and argument, the court made an oral ruling granting UAMPS's motions, concluding that Benzer's experts' original reports were "very deficient." A few days later, Benzer filed a motion asking the court to reconsider and amend its order and, instead of excluding Engineer and Surveyor, allow depositions to be taken of these experts which would "cure any potential prejudice" that UAMPS might otherwise suffer. Benzer contended that Engineer and Surveyor were "critical to" its realignment counterclaim, so much so that the experts' exclusion would be "tantamount to dismissing [Benzer's] defense." The court declined Benzer's invitation to amend its ruling, and it later issued a written order barring Engineer and Surveyor from testifying at trial and barring Benzer from otherwise offering their opinions into evidence.

¶20 After excluding evidence from Benzer's experts, the court then granted UAMPS's earlier-filed motion for summary judgment in its favor on Benzer's entire counterclaim. The court gave several reasons for its decision. First, the court concluded

that Benzer's counterclaim had been rendered moot by UAMPS's voluntary decision to relocate the Guy Pole. Second, the court concluded that Benzer's counterclaim was barred by Utah's governmental immunity statutes, which require putative plaintiffs to give notice of any "claims" they intend to bring against the government; Benzer had not filed any notice of claim. And third, the court concluded that Benzer's claims failed on their merits in any event, because without testimony from experts, Benzer could not meet its burdens under the Realignment Statute.

¶21    After the court's summary judgment ruling, Benzer filed a motion asking the court to reopen expert discovery and reconsider its order excluding Benzer's experts. In connection with this motion, Benzer argued—for the first time—that the Realignment Statute did not place any burden on Benzer to establish that realignment was reasonably possible; instead, Benzer asserted that the statute "presumes" that Benzer can realign the Easement and that this "presumption must be rebutted by UAMPS." After briefing and argument, the court denied Benzer's motion, specifically rejecting Benzer's position that the Realignment Statute placed any burden of proof on UAMPS.

¶22    In this same written order, the court also concluded that final judgment could enter, determining that its earlier order granting summary judgment to UAMPS on its main claim for easement interference and awarding declaratory and injunctive relief "effectively mooted" UAMPS's trespass and nuisance claims because UAMPS had made an election of remedies and had chosen to seek an order compelling Benzer to move the house (instead of an order compelling Benzer to pay damages). And it rejected Benzer's argument that UAMPS had brought those two claims in bad faith, and on that basis denied Benzer's request— brought under Utah's bad-faith attorney fees statute—for attorney fees incurred in litigating those claims.

¶23    The court then entered judgment in UAMPS's favor, including a declaration that the house on Lot 55 "constitutes an unreasonable per se interference with the Easement" and an injunction commanding Benzer, within sixty days, to "remove from the Easement . . . any portions of the [house] that currently encroach on" the Easement. The injunction further provided that, if Benzer did not remove the house within the time frame provided, "UAMPS may hire contractors and engineers of its choosing, at [Benzer's] cost, to coordinate, assist, and remove all portions of the [house] that encroach on" the Easement.[3]

## ISSUES AND STANDARDS OF REVIEW

¶24    Benzer now appeals the court's judgment, and it raises several issues for our consideration. First and foremost, Benzer challenges the dismissal of its counterclaim, especially the part seeking statutory realignment. Because the court dismissed the counterclaim on summary judgment, in part on statutory interpretation grounds, our review of the court's ruling is for correctness, affording no deference to that ruling. *See USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 28, 235 P.3d 749 ("We review the district court's summary judgment ruling for correctness and view all facts and reasonable inferences in favor of the nonmoving party." (quotation simplified)); *see also Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863 ("We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions." (quotation simplified)).

---

3. Following entry of judgment, Benzer asked the district court for a stay of enforcement of the judgment pending appeal. The record submitted to us contains no indication that any ruling was ever made on that motion. We assume, for purposes of this appeal, that the house remains in its original location; certainly, neither party asserts that this appeal has been mooted by a post-judgment relocation of the house.

¶25 However, dismissal of the counterclaim also implicates the court's exclusion of Benzer's expert witnesses, and our review of the court's exclusion order requires a more nuanced approach. On that issue, a district court's "interpretations of the Utah Rules of Civil Procedure are questions of law" that we review for correctness, but we extend "a great deal of deference" to district courts in matters of discovery; thus, a court's discovery orders are reviewed "for abuse of discretion." *RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 18, 392 P.3d 956 (quotation simplified).

¶26 Next, Benzer challenges the court's ruling that UAMPS had not brought its trespass and nuisance claims in bad faith, and the court's associated determination that Benzer was not entitled to recover attorney fees, under Utah's bad-faith attorney fees statute, incurred in litigating those claims. "We review a [district] court's grant of attorney fees under the bad faith statute as a mixed question of law and fact." *Verdi Energy Group, Inc. v. Nelson*, 2014 UT App 101, ¶ 13, 326 P.3d 104 (quotation simplified). Attorney fees under this statute are available to a prevailing party when it can show that its opponent's action was without merit and not brought in good faith. *See Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 24, 507 P.3d 357. A court's determination on whether an action or claim is "without merit" is reviewed for correctness, while a finding related to "bad faith" is reviewed "under the clearly erroneous standard." *Id.* (quotation simplified). In this case, the attorney fees inquiry also implicates the district court's ruling that effectively dismissed UAMPS's trespass claim due to its election of remedies. To the extent that this issue raises questions of law related to the dismissal of these two tort claims, we review the court's decision for correctness. *See Linebaugh v. Gibson*, 2020 UT App 108, ¶ 21, 471 P.3d 835.[4]

---

4. Benzer also challenges the court's denial of its motion to reopen discovery, a ruling which we would review for abuse of

(continued…)

ANALYSIS

## I. Benzer's Counterclaim

¶27   We first address Benzer's challenge to the district court's dismissal of its counterclaim. As noted, the court dismissed this counterclaim for various reasons. First, it identified several preliminary issues with the counterclaim that, if applicable, would require its dismissal before even considering its merits. Second, the court dismissed the realignment portion of the counterclaim based, in part, on its interpretation of the Realignment Statute. And third, it dismissed the realignment counterclaim on the basis that Benzer could not support it given the exclusion of its experts. We address these matters in turn.

### A. Preliminary Issues

¶28   Initially, we find it necessary to address three preliminary issues related to the viability of Benzer's counterclaim. First, we address the district court's ruling that the counterclaim is barred by the Utah Governmental Immunity Act (the UGIA). *See* Utah Code §§ 63G-7-101 to -904. Second, we examine UAMPS's assertion that the Realignment Statute, by its terms, does not apply here at all. And finally, we address UAMPS's assertion that Benzer's counterclaim has been rendered moot. In the end, we conclude that none of these preliminary issues require dismissal of Benzer's counterclaim.

---

discretion, *see Stoddard v. Smith*, 2001 UT 47, ¶ 22, 27 P.3d 546, and the court's denial of its motion to amend an earlier order related to the exclusion of Benzer's experts, also reviewed for abuse of discretion, *see Mower v. Simpson*, 2017 UT App 23, ¶ 43, 392 P.3d 861, *cert. denied*, 392 P.3d 861 (Utah 2017). However, our reversal of the court's exclusion of Benzer's experts effectively moots its challenge to these other two orders, and we therefore need not further address these issues here.

1

¶29   The UGIA provides that anyone wishing to assert a "claim against a governmental entity" is barred from doing so "unless notice of claim is filed . . . within one year after the claim arises." *Id.* § 63G-7-402. It is undisputed that UAMPS is a "governmental entity" as that term is used in the UGIA. *See id.* § 63G-7-102(4)(a) (stating that a "governmental entity" includes "the state and its political subdivisions"); *id.* § 11-13-203(1)(c) (stating that an "interlocal entity" such as UAMPS is "a political subdivision of the state"). It is also undisputed that Benzer did not file any notice of claim within one year after its claim against UAMPS arose. In light of these facts, the district court concluded that Benzer's counterclaim was barred by the UGIA. Benzer takes issue with this conclusion, and we find merit in Benzer's position.

¶30   The UGIA's notice of claim provision is triggered only when a litigant wishes to assert a "claim" against a governmental entity. *Id.* § 63G-7-402. The term "claim" has been assigned a statutory definition in this context; under that definition, "claim" is defined as "any asserted demand for or cause of action for money or damages." *Id.* § 63G-7-102(2). Benzer correctly points out that, in the final and operative iteration of its counterclaim, it did not seek "money or damages"; instead, it sought only injunctive and declaratory relief. Under the plain terms of the UGIA as interpreted by our supreme court, claims for injunctive and declaratory relief "are not subject to the UGIA because they are not asserted demands for or causes of action for money or damages." *See Pinder v. Duchesne County Sheriff*, 2020 UT 68, ¶ 64, 478 P.3d 610 (quotation simplified); *see also Houghton v. Department of Health*, 2005 UT 63, ¶ 19 n.3, 125 P.3d 860 (stating that equitable claims in general "are not governed by the notice of claim provisions of the [UGIA]," and therefore any party "asserting an equitable claim" against a government agency is "not bound by the" UGIA's notice requirements).

¶31    Accordingly, the fact that Benzer did not file a notice of claim pursuant to the UGIA prior to filing its counterclaim is not an appropriate basis for dismissal of its operative counterclaim. The district court's determination to the contrary was error.

2

¶32    UAMPS next asserts that Benzer's realignment counterclaim was properly dismissed because, in its view, the Realignment Statute is inapplicable here. UAMPS offers three reasons for its viewpoint, which we discuss in turn.[5]

¶33    **"Municipality."** First, UAMPS asserts that the Realignment Statute can only be invoked against "municipalities," and it asserts that it is not a "municipality" as that term is statutorily defined. We reject this argument.

¶34    UAMPS correctly quotes the Realignment Statute: the relevant provision of that statute uses the term "municipality," and states that "[i]f a *municipality* acquires a utility easement through the exercise of its eminent domain power for use under this section, the owner of the servient estate may," under certain circumstances, "realign the easement." Utah Code § 10-8-14.5(3) (emphasis added). The term "municipality" is, in this context, assigned a statutory definition. *See id.* § 10-1-104(5). Under that definition, a "municipality" is a "city" of the first, second, third,

---

5. The district court did not rule on each of UAMPS's arguments discussed in this section, presumably because it found other grounds on which to base its dismissal of Benzer's counterclaim. But because UAMPS offers these arguments as alternative grounds for affirmance, and because these issues are likely to be raised again on remand, we elect to address them here. *See State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867 (stating that, when "there are other issues presented on appeal that will likely arise" on remand, we may "exercise our discretion to address those issues for purposes of providing guidance on remand").

fourth, or fifth class; a "town"; or "a metro township." *Id.* UAMPS points out that it is an "interlocal entity," *see id.* § 11-13-203(1), and it rests its argument upon the fact that the term "interlocal entity" is not included in the relevant definition of "municipality."

¶35     But UAMPS overlooks the fact that, by statute, interlocal entities enjoy the same powers, and are subject to the same rules and restrictions, as their individual members. UAMPS was created pursuant to the Utah Interlocal Cooperation Act (UICA). *See id.* §§ 11-13-101 to -608. That statute's purpose is to allow multiple public agencies, including cities and towns, to work together to jointly exercise their governmental powers. *See id.* § 11-13-102. Under UICA, "[a]ny power, privilege, or authority exercised or capable of exercise by a Utah public agency"—a term that includes all of UAMPS's members, be they cities, towns, or special districts, *see id.* § 11-13-103(19)—"may be exercised and enjoyed jointly with any other Utah public agency having the same power, privilege or authority." *Id.* § 11-13-201(1)(a). Importantly for present purposes, our supreme court has stated— in a case involving UAMPS and requiring application of the then-current version of UICA—that "UAMPS has the same powers, privileges, and authority accorded its individual political subdivisions." *Utah Associated Mun. Power Sys. v. Public Service Comm'n of Utah*, 789 P.2d 298, 299 (Utah 1990).

¶36     UAMPS's assertion that it is not bound by the restrictions of the Realignment Statute therefore misses the mark. Even if it is not technically a "municipality" as that term is defined in the Realignment Statute, it is subject to that statute's restrictions, because as an interlocal entity it enjoys the same powers and is subject to the same restrictions as its individual members. *See CP Nat'l Corp. v. Public Service Comm'n*, 638 P.2d 519, 521 (Utah 1981) (stating that "the intent of [UICA] appears to be to allow municipalities collectively to exercise powers which they already possess individually"). In this appeal, UAMPS makes no assertion that its individual members would not be subject to the

Realignment Statute if, acting alone, they exercised their eminent domain power to acquire a utility easement. Because it is apparently uncontested that UAMPS's individual members would be subject to the Realignment Statute if they were to act alone, and because interlocal entities possess the same powers and are subject to the same restrictions as their individual members, it follows that UAMPS is subject to the Realignment Statute whenever it exercises its eminent domain power to acquire a utility easement.

¶37    **Easement vs. Infrastructure.** Next, UAMPS asserts that the Realignment Statute applies only to situations in which a landowner wishes to relocate the boundaries of the easement itself, and not to situations in which a landowner wishes to relocate already-existing infrastructure. According to UAMPS, "nothing" in the Realignment Statute "suggests that Benzer can force realignment of permanent electrical infrastructure." In our view, however, the distinction UAMPS attempts to draw is one without a meaningful difference.

¶38    UAMPS acknowledges that, under the Realignment Statute, a landowner is afforded an opportunity to realign a public utility easement. Yet realignment of the boundaries of an easement would, ipso facto, render unlawful any existing infrastructure located outside the boundaries of the relocated easement, and would therefore require the realignment of the infrastructure itself. Stated another way, if the boundaries of the Easement are realigned so as to no longer encompass the land upon which the guy wires are located, then the guy wires may no longer lawfully exist in that location. In light of these realities, a request to relocate an existing structure located within an easement is not practically different from a request to relocate the boundaries of the easement itself.

¶39    Moreover, under UAMPS's interpretation of the Realignment Statute, a landowner would never be able to use that

statute to realign existing utility infrastructure; in that regime, the Realignment Statute would be available to landowners only pre-construction, before any utility infrastructure has been built. Nothing in the language of the Realignment Statute limits its reach to only pre-construction situations, and we decline UAMPS's invitation to read that limitation into the statute.

¶40 **Unclean Hands.** Finally, UAMPS asserts that Benzer may not avail itself of its statutory realignment right because it violated the plain terms of the Easement by building a permanent structure inside the Easement's boundaries. UAMPS argues that Benzer's actions have given it "unclean hands," a situation that it claims has effected a forfeiture of Benzer's right to invoke the Realignment Statute.

¶41 But UAMPS cites no authority supporting the proposition that an *equitable* doctrine such as unclean hands operates to forfeit a litigant's *statutory* right. Certainly, the doctrine of unclean hands can, where applicable, operate to deprive the "unclean" party of its right to invoke equitable doctrines. *See Hill v. Estate of Allred*, 2009 UT 28, ¶ 21, 216 P.3d 929 ("The clean hands doctrine finds expression in the maxim that 'he who seeks equity must do equity.'" (quotation simplified)). But as we understand it, the availability of a statutory right turns not on the potential applicability of equitable doctrines but, instead, on the language our legislature chose to employ in drafting the statutory scheme at issue; certainly, UAMPS has not persuaded us that the situation is otherwise. And nothing in the Realignment Statute indicates that the statute's reach is to be shortened in instances where the party invoking it might be subject to the equitable doctrine of unclean hands. We therefore reject UAMPS's assertion that Benzer's construction of the house on the Easement—in now-uncontested violation of the terms of the Easement—operates to forfeit Benzer's right to invoke the Realignment Statute.

¶42 Accordingly, for the foregoing reasons, we find unpersuasive all of UAMPS's arguments that the Realignment Statute is generally inapplicable in this case.

3

¶43 The final preliminary issue we must address is UAMPS's contention that Benzer's counterclaim has been rendered moot. This assertion depends on two premises: first, that Benzer's counterclaim had nothing to do with realignment of the guy wires on Lot 55 and everything to do with relocation of the Guy Pole; and second, that UAMPS's voluntary relocation of the Guy Pole therefore rendered the entire counterclaim moot. We agree with UAMPS that its relocation of the Guy Pole rendered *that portion* of Benzer's counterclaim moot. But we agree with Benzer that its counterclaim, when read liberally, included a claim for realignment of the guy wires on Lot 55, and that portion of its counterclaim is by no means moot.

¶44 Both sides agree that Benzer's counterclaim contained allegations regarding relocation of the Guy Pole. UAMPS sensibly asserts that its voluntary relocation of the Guy Pole has afforded Benzer all of the relief it sought in that regard, and therefore its claims concerning that issue are moot. *See State v. Steed*, 2015 UT 76, ¶ 6, 357 P.3d 547 ("An argument is moot if the requested judicial relief cannot affect the rights of the litigants. In other words, an appeal is moot if the controversy is eliminated such that it renders the relief requested impossible or of no legal effect." (quotation simplified)). Benzer resists this conclusion, asserting that UAMPS's relocation of the Guy Pole might somehow be "temporary" and that there is at least some chance that it might move the Guy Pole back to its original location. This argument is not well-taken. The relief Benzer sought regarding the Guy Pole was a declaration stating that UAMPS was not permitted to maintain a pole in a public roadway and an order commanding UAMPS to remove it. Such relief would be pointless now, where

UAMPS is no longer attempting to maintain a pole in a public roadway. We therefore agree with UAMPS that the portion of Benzer's counterclaim concerning the Guy Pole has been rendered moot by subsequent events. The district court did not err by dismissing that portion of the counterclaim on that basis.

¶45 But we agree with Benzer that its counterclaim was not limited to allegations regarding the Guy Pole. While not exactly a model of clarity, the counterclaim contains allegations regarding Lot 55 and the house, and it contains a specific request for relief regarding realignment of the "easements to the north and to the west of the Pole," which the parties agree is a reference to both the Guy Pole and the guy wires. And Benzer's answer to UAMPS's complaint—contained in the same document as the counterclaim—includes an affirmative defense specifically seeking "realignment of the guy wire easement."[6]

¶46 Under Utah law, pleadings are to be liberally construed; a pleading is sufficient if it provides "fair notice of the nature and basis of the claim asserted and a general indication of the type of litigation involved." *Southern Utah Wilderness All. v. San Juan County Comm'n*, 2021 UT 6, ¶ 40, 484 P.3d 1160 (quotation simplified); *accord Zubiate v. American Family Ins.*, 2022 UT App 144, ¶ 11, 524 P.3d 148. And there is no doubt that UAMPS had fair notice that Benzer was seeking realignment of the guy wires, and not just the Guy Pole; after all, the parties have been zealously litigating that claim for years. We therefore reject UAMPS's assertion that Benzer's counterclaim did not include allegations related to the guy wires on Lot 55, as well as its concomitant assertion that Benzer's entire counterclaim should be dismissed

---

6. In addition, the exhibits attached to Benzer's pleading provided further information about the nature of its claims. One exhibit shows a map of the area and illustrates the exact location of the guy wires, and another contains photographs of the guy wires.

as moot. Accordingly, the district court erred by dismissing that portion of Benzer's counterclaim on mootness grounds.

### B. The Realignment Statute: Burden of Proof

¶47 Having concluded that Benzer's counterclaim, fairly construed, includes a statutory claim for realignment of the guy wires, and that this portion of its counterclaim is not subject to dismissal for any of the general non-merits reasons proffered by UAMPS, we now turn to the merits of Benzer's realignment counterclaim. That inquiry requires us to address the parties' interpretive dispute about which of them bears the burden of proof under the Realignment Statute. UAMPS asserts that the burden of proof lies with the landowner (here, Benzer). The district court agreed with UAMPS on this point, and so do we.

¶48 The Realignment Statute provides, in relevant part:

> If a municipality acquires a utility easement through the exercise of its eminent domain power for use under this section, *the owner of the servient estate may realign the easement at the servient estate owner's expense unless the alignment cannot be reasonably changed because of engineering or safety requirements.*

Utah Code § 10-8-14.5(3) (emphasis added). We have already determined, *supra* ¶¶ 33–36, that this statute applies to UAMPS, and it is undisputed that UAMPS acquired the Easement through the exercise of its eminent domain power. Thus, the portion of the statute at issue in this section of our opinion is the language emphasized above: in particular, the parties take different positions as to which of them bears the burden of demonstrating that "the alignment [of a utility easement] cannot be reasonably changed because of engineering or safety requirements."

¶49 With regard to the language at issue, Benzer makes two arguments. First, it asserts that the statutory language creates a

"rebuttable presumption" that "the servient estate owner will be allowed to realign the easement at its own expense if the easement was obtained using eminent domain." And second, it asserts that the statutory language supports the notion that the burden is on the dominant estate holder (here, UAMPS) "to demonstrate that its chosen alignment of its easement cannot reasonably be changed because of engineering or safety concerns." We find neither of Benzer's arguments compelling.

¶50 First, we find no support in the statutory text for any "rebuttable presumption" in favor of realignment. Certainly, the Realignment Statute does not use the phrase "rebuttable presumption," nor does it even use the word "presumption." Benzer, however, focuses on the statute's use of two words— "may" and "unless"—and asserts that it has a presumptive right to realign the easement, which presumption may be rebutted only in situations where the "alignment cannot be reasonably changed." Benzer's assertions have some force: to be sure, the Realignment Statute does afford servient estate owners a right to demand realignment, and it specifies that this right does not apply in situations where the alignment cannot reasonably be altered. But Benzer overreads the operative language when it discerns therein a "rebuttable presumption" in its favor.

¶51 Our legislature knows how to create a rebuttable presumption when that is its intent; indeed, it has done so on numerous occasions in other sections of the Utah Municipal Code. *See, e.g.*, Utah Code § 10-2-422 (providing that, if certain conditions are met, "[a]n area annexed to a municipality . . . shall be *conclusively presumed* to have been validly annexed" (emphasis added)); *id.* § 10-8-2(3)(b)(ii) (stating that, when appropriating money for certain purposes, a "municipal legislative body's determination of value received is *presumed valid*" (emphasis added)); *id.* § 10-9a-511(4)(c)–(d) (providing that, in certain instances, "[a]bandonment" of a property "*may be presumed*" but the owner of said property "*may rebut the presumption*" (emphases

added)). We consider the legislature's omission of any such language here to be meaningful. *See Northern Monticello All., LLC v. San Juan County*, 2022 UT 10, ¶ 29, 506 P.3d 593 (finding meaningful the legislature's "omission" of certain language and noting that the "legislature knows how to" include such language when that is its intent); *Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 19, 506 P.3d 509 ("When looking at the plain language, we presume that the Legislature used each word advisedly, and deem all omissions to be purposeful." (quotation simplified)); *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 21, 428 P.3d 1096 ("We will not infer substantive terms into the text that are not already there. Rather the interpretation must be based on the language used, and we have no power to rewrite the statute to conform to an intention not expressed." (quotation simplified)). As we interpret the Realignment Statute, its plain terms do not permit an interpretation that provides servient estate owners a "rebuttable presumption" in favor of realignment.

¶52 And that leads us to Benzer's second argument: its contention that the Realignment Statute places on the dominant estate owner the burden of demonstrating that the easement's "alignment cannot be reasonably changed." On this score, we consider the statutory language potentially ambiguous, because it does not clearly state, one way or the other, which party is to bear the burden of proof in realignment situations. But on balance, we find UAMPS's arguments more persuasive, and more in keeping with textual clues present in the statutory language.

¶53 As we see it, the most consequential textual clue is found in the statute's language placing all expenses of realignment on the servient estate owner. *See* Utah Code § 10-8-14.5(3) (stating that realignment, if it is to occur, must take place "at the servient estate owner's expense"). Among the expenses that a servient estate owner must expect to pay are, of course, the expenses associated with actually relocating any equipment or structures. But the statute expressly mentions "engineering [and] safety

requirements," and allows realignment only when it can be accomplished in accordance with such requirements. *Id.* As this case demonstrates, realignment of electric energy infrastructure can often take place only after potentially expensive consultations with experts such as engineers and land surveyors. There are no exceptions to the statutory requirement that the servient estate owner pay the costs of realignment; indeed, in placing the burden of shouldering the "expense" of realignment on the servient estate owner, our legislature expects the servient estate owner to pay not only the construction costs associated with actually moving the affected infrastructure but also the costs associated with demonstrating that the move is in keeping with engineering and safety requirements. The statute's expense provision therefore is strong evidence that the legislature intended the burden of demonstrating the feasibility of realignment to lie with the servient estate owner.

¶54　Moreover, we (like the district court) find persuasive UAMPS's contention that Benzer's proposed interpretation—that the dominant estate owner bears the burden of proving that no conceivable realignment is feasible—would work impractical (if not absurd) results. As UAMPS points out, this reading would require the dominant estate owner "to imagine every potential realignment scenario and then prove each one unworkable," a task that would require it to hire and pay experts "to determine whether those innumerable potential placements are either unsafe or violate safety standards." We find it hard to imagine that this is what our legislature intended. By contrast, a rule requiring the party requesting realignment to identify a proposed location for realignment and to shoulder the costs of demonstrating that the specific proposed relocation meets engineering and safety standards is a much simpler approach that strikes us as harmonious with the applicable statutory text.

¶55　The facts of this case illustrate the unworkability of Benzer's proposed interpretation. Here, everyone agrees that

there is at least one feasible realignment option: replacing the affected power pole with a standalone pole that does not require guy wires. But Benzer does not like this option, presumably because of the cost involved. The question presented here, therefore, is this one: under the statute, whose responsibility is it to identify additional relocation options—other than a standalone pole—that are in keeping with applicable standards? If that burden lies with UAMPS, it would apparently need to keep coming up with option after option until it identifies one Benzer likes; as Benzer sees it, the servient owner has the right to keep vetoing options proposed by the dominant owner, ad infinitum, until the dominant owner hits upon one the servient owner likes. This is an impractical (if not absurd) result. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 26, 267 P.3d 863 ("Generally, when interpreting statutes we seek to avoid interpretations which render some part of a provision nonsensical or absurd. Thus, when statutory language presents the court with two alternative readings, we prefer the reading that avoids absurd results." (quotation simplified)). In our view, the Realignment Statute requires the servient owner—the one requesting realignment—to shoulder the burden of identifying an acceptable realignment option and of demonstrating that its option meets engineering and safety requirements.

¶56    For these reasons, then, we conclude that the district court correctly interpreted the Realignment Statute to place the burden of proof on Benzer to identify a specific realignment option that satisfies applicable engineering and safety requirements.

## C. The District Court's Dismissal Order

¶57    The final question we must address, in evaluating the district court's dismissal of Benzer's realignment counterclaim, is whether the court correctly determined, as a matter of law on summary judgment, that Benzer could not meet its statutory

burden. On two independent grounds, we conclude that the court erred in dismissing Benzer's realignment counterclaim.

1

¶58    As an initial matter, we discern error in the court's wholesale dismissal of Benzer's counterclaim on the straightforward basis that all parties agree that the evidence supports at least one feasible realignment option: replacement of the affected power pole with a standalone pole that does not require guy wires. With regard to that option, Benzer has clearly met any burden of proof it has under the Realignment Statute.

¶59    As already noted, the Realignment Statute applies to UAMPS here. Moreover, it is undisputed that UAMPS acquired the Easement through eminent domain. It is also undisputed that Benzer timely and properly invoked the Realignment Statute, making a request that UAMPS relocate the guy wires on Lot 55. And there is one realignment option that both sides agree is feasible and meets all engineering and safety requirements: replacing the affected power pole with a standalone pole.

¶60    Thus, the district court should not have commanded relocation of the house as Benzer's only option here. At a minimum, Benzer has a right to realign the Easement if it is willing to pay the costs of erecting the standalone pole. At least to that extent, dismissal of Benzer's counterclaim was improper.

2

¶61    Benzer, however, does not appear to like the standalone pole option very much; indeed, if Benzer were forced to choose between tearing down and relocating the house on Lot 55 or paying for a standalone pole, it is by no means obvious which choice Benzer would make. But in place of either of those options, Benzer would very much prefer for the guy wires on Lot 55 to be relocated over to Lot 54. The question we must now address is

whether the district court correctly dismissed Benzer's specific claim for realignment of the guy wires onto Lot 54.

¶62 The district court dismissed Benzer's claim in this regard on its merits, after determining that Benzer could not meet its burden of demonstrating that relocating the guy wires onto Lot 54 could be done commensurate with engineering and safety requirements. This ruling, in turn, was a function of the court's earlier order excluding Benzer's expert witnesses from offering any evidence at trial. Benzer acknowledges that, without expert testimony, it cannot bear its burden of demonstrating that relocation of the guy wires onto Lot 54 is feasible. Thus, its challenge to the court's dismissal of its specific realignment claim is dependent on its subsidiary challenge to the court's order barring its experts from testifying. For the reasons discussed, we find merit in Benzer's challenge to the court's exclusion order.

¶63 The court based its exclusion of Benzer's experts in the language of rule 26 of the Utah Rules of Civil Procedure, which requires that expert reports "contain a complete statement of all opinions the expert will offer at trial and the basis and reasons for them." Utah R. Civ. P. 26(a)(4)(B). After reviewing the experts' submissions, the district court ruled that those reports did not contain a recitation of any actual opinions, nor did they contain "the basis and reasons for" any opinions. We read the experts' submissions differently than the district court did.

¶64 In our view, the reports submitted by Engineer and Surveyor, considered together, contain two clearly stated opinions. First, Engineer opines that realignment can be achieved by replacing the existing power pole "with [a] new self-supporting steel pole," an option he thought would cost about $180,000. Second, the reports (taken together) offer the opinion that the guy wires on Lot 55 can be realigned onto Lot 54, in a way that "satisf[ies] all design and easement standards," in one of two possible alternative configurations as depicted in Surveyor's

drawings. According to Engineer, this option would cost about $15,000. Thus, the district court erred when it concluded that Benzer's experts' reports did not contain any opinions.

¶65 The court also concluded that the experts did not offer "the basis and reasons for" those opinions. After reviewing the reports ourselves, we acknowledge that these submissions are far shorter than expert reports usually are, and that they do not look like the typical rule 26 reports experts often submit. But the reports *do* nevertheless contain at least *some* "basis and reasons for" the stated opinions. In particular, Engineer made a note of UAMPS's recent relocation of the Guy Pole from the public roadway, and offered his view that UAMPS had made "a structural criteria exception for the wires down load case" in order to accomplish that relocation. He then stated that, if the same "structural criteria exception" were made in connection with relocating the guy wires on Lot 55, those wires could be relocated onto Lot 54 "by installing new [guy wires] and possibl[y] a stub pole in the rear of Lot 54," and that this relocation would "satisfy all design and easement standards." And while Engineer's report contains no specific suggestions regarding exactly where on Lot 54 the guy wires could be located, Surveyor's drawings, submitted along with Engineer's report, offer two different location options. We therefore disagree with the district court's conclusion that Benzer's experts included no "basis" or "reasons for" their opinions. In our view, the experts' submissions—while by no means a model of how things should be done under rule 26—do contain opinions as well as at least some basis for them.

¶66 The rule itself provides a remedy for reports that contain spare or incomplete information: an expert "may not testify in a party's case-in-chief regarding any matter not fairly disclosed in the report*." Id.* Thus, the proper remedy—and the one the court should have imposed here—is not complete exclusion of the experts' testimony but, instead, exclusion only of testimony about matters "not fairly disclosed" in the reports. The district court's

ruling ordering wholesale exclusion of Engineer's and Surveyor's testimony was error.

¶67    Our conclusion that Engineer and Surveyor should have been allowed to testify about matters that *were* "fairly disclosed" in their reports raises two related questions, neither of which were properly (if at all) considered by the district court. Can Benzer meet its burden of proof under the Realignment Statute if its experts are allowed to testify but are limited to testifying only about things that were "fairly disclosed" in their rather spare initial reports? And if not, should Benzer be allowed to rehabilitate Engineer through introduction of the rebuttal report—submitted some two months after his initial report—on the basis that the rebuttal report qualifies as a harmlessly untimely initial report? The district court should consider these questions on remand, but we offer some limited guidance in this regard that we hope will be of assistance.

¶68    Recall that the district court dismissed Benzer's realignment counterclaim on the basis that Benzer would be allowed to present *no* expert testimony. We have determined that the court's ruling disallowing *all* testimony from Engineer and Surveyor was error; those experts should be allowed, at a minimum, to offer testimony about the opinions listed in their reports, as supported by the "basis and reasons for" those opinions that are "fairly disclosed" in those reports. Now that Benzer has *some* expert testimony in its corner rather than *none*, the district court should reevaluate whether Benzer's realignment counterclaim, as concerns relocation of the guy wires, can survive summary judgment.

¶69    The answer to this question may be influenced by whether the court considers Engineer's rebuttal report. UAMPS correctly points out that Engineer included a lot of additional information in his rebuttal report that was not included in his two-page initial report. Indeed, UAMPS acknowledged, at oral argument before

this court, that Engineer's rebuttal report includes all required information, and that it contains enough detail to allow a fulsome and meaningful rebuttal from UAMPS's own expert. We understand this acknowledgement to mean that, if Engineer's rebuttal report is considered by the court, Benzer can survive summary judgment on its realignment counterclaim regarding relocation of the guy wires.

¶70   Whether Engineer's rebuttal report should be considered turns, in our view, on whether UAMPS sustained harm as a result of obtaining the information contained in that report in April instead of February 2020. The new information found in the rebuttal report was not timely submitted; it certainly should have been submitted in February, as part of Engineer's initial report. In this situation, "where it is undisputed that an expert witness report has been untimely filed, the proper inquiry is whether" the party's failure to timely submit the report was "harmless" or excused by "good cause." *See R.O.A. Gen., Inc. v. Chung Ji Dai*, 2014 UT App 124, ¶ 11, 327 P.3d 1233 (quotation simplified), *cert. denied*, 337 P.3d 295 (Utah 2014); *see also* Utah R. Civ. P. 26(d)(4) (stating that, if a party fails to make a required disclosure in a timely fashion, "that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure"). When asked about harm at oral argument, UAMPS's counsel stated that UAMPS had been harmed by not learning Engineer's information until April, because the delay caused UAMPS's expert to become "locked in" to opinions he rendered in a response report that was prepared without the benefit of reviewing the information and conclusions in Engineer's rebuttal report. But UAMPS's counsel acknowledged that all such prejudice could be alleviated by allowing UAMPS's expert to prepare a sur-rebuttal report, paid for by Benzer. While the district court considered other discovery-related questions, including whether to allow depositions of Benzer's experts (it decided not to), it did not

squarely confront the question of whether Engineer's rebuttal report should be considered as a harmlessly untimely initial report, perhaps with allowance for a Benzer-funded sur-rebuttal report. Whether to allow Benzer to remedy the situation in this manner is a question within the district court's discretion. In light of this deferential standard of review, the district court should, on remand, consider the "harmlessness" question in the first instance. *See De La Cruz v. Ekstrom*, 2024 UT App 18, ¶ 29 (Harris, J., concurring).

¶71 Thus, the district court should not have completely barred Benzer's experts from testifying at trial. Instead, it should have simply limited those experts to testimony related to matters that were "fairly disclosed" in their reports. On remand, it should determine whether consideration of Engineer's rebuttal report would actually harm UAMPS, and if so whether any such harm can be easily remediated. And after making these rulings, it should reconsider the merits of Benzer's realignment counterclaim, and should specifically consider whether, given the measure of expert testimony allowed, Benzer can satisfy the burden of proof imposed upon it under the Realignment Statute.

¶72 Accordingly, we vacate the district court's order dismissing Benzer's counterclaim for realignment of the guy wires on Lot 55, and we remand this matter for further proceedings consistent with this opinion.

## II. Trespass and Bad-Faith Attorney Fees

¶73 The other issue on appeal, aside from the court's dismissal of Benzer's counterclaim, is Benzer's challenge to the court's ruling that it was not entitled to recovery of its attorney fees, under Utah's bad-faith attorney fees statute, incurred in litigating

UAMPS's trespass claim.[7] We perceive no error in the court's denial of Benzer's request for fees under the bad-faith statute.

¶74 Under Utah law, a court has the authority to award attorney fees to a party who prevails on a meritless claim or defense that its opponent brought in bad faith. *See* Utah Code § 78B-5-825(1) (stating that "the court shall award reasonable attorney fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith"). Before awarding fees under this section, a district court—in addition to making a determination that the party requesting fees is the "prevailing party"—must make specific findings that a party's claim is (1) "without merit" and (2) "not brought or asserted in good faith." *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 2020 UT 47, ¶ 76, 469 P.3d 1003 (quotation simplified). These two findings "must be made independently" from one another. *Still Standing Stable, LLC v. Allen*, 2005 UT 46, ¶ 12, 122 P.3d 556. As noted, we review a court's "without merit" determination for correctness, but we review its "bad faith" determination deferentially. *See Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 24, 507 P.3d 357.

¶75 In order to demonstrate that an opponent's claim or defense is "without merit" for purposes of the bad-faith statute, the movant must demonstrate more than simply that the claim or defense is a loser. *See McFarland v. McFarland*, 2024 UT App 31, ¶ 33 (stating that "a determination that a party lost on the merits is not equivalent to a determination that the party's claims were

---

7. It is unclear from Benzer's briefing whether Benzer intends this argument to also apply to UAMPS's nuisance claim. Benzer's unclear briefing on this point leads us to conclude that, to the extent Benzer intended to include that argument, it has failed on grounds of inadequate briefing to carry its burden of persuasion on appeal. We therefore do not further separately discuss the nuisance claim in connection with this discussion.

without merit for purposes of the bad-faith statute"); *see also In re Olympus Constr. LC*, 2009 UT 29, ¶ 31, 215 P.3d 129 (concluding that a losing claim was not "without merit," because the claim—even though it was not a winner—involved a question of "first impression" and "had a basis in law and fact"). Indeed, our supreme court has stated that the term "without merit," in this context, "implies bordering on frivolity," with the term "frivolous" meaning "of little weight or importance having no basis in law or fact." *See Cady v. Johnson*, 671 P.2d 149, 151 (Utah 1983) (quotation simplified); *accord Migliore v. Livingston Fin., LLC*, 2015 UT 9, ¶ 31, 347 P.3d 394. In our view, UAMPS's trespass claim does not fall into this category.

¶76   Benzer rests its argument on the notion that a trespass claim—especially one for damages—is always improper as between the owners of dominant and servient estates. As support for this proposition, Benzer cites a New York case from 1961 and an American Law Reports annotation. *See Meadow Point Props., Inc. v. Nick Mazzaferro & Sons*, 219 N.Y.S.2d 908, 910 (Sup. Ct. 1961) (stating that a trespass action "is inapplicable to an easement"); *Proper Remedy for Interference with Right of Way*, 47 A.L.R. 552 (1927) (stating that "[t]respass cannot be maintained for an interference with a right of way"). Benzer does not cite any Utah law directly on point; the closest it comes is to provide a citation to our supreme court's general pronouncement that "trespass is a possessory action." *See Walker Drug Co. v. La Sal Oil Co.*, 972 P.2d 1238, 1243 (Utah 1998) (quotation simplified). On the other side of the ledger, UAMPS directed the district court to a Georgia case stating that "a 'trespass' upon an easement means use of the property in violation of the easement terms." *See Richardson v. Georgia Power Co.*, 708 S.E.2d 10, 12 (Ga. Ct. App. 2011). And UAMPS emphasizes that Benzer—despite awareness of the Easement and the presence of the guy wires—built a house within the boundaries of the Easement, even though the Easement Documents clearly prohibit the "erect[ion of] buildings and/or structures within" the Easement and even though the Easement

Documents authorize UAMPS to "clear the [E]asement of all structure[s], obstructions, and/or other objects" to the extent that those structures "interfere with or threaten to endanger the operation or maintenance of" UAMPS's systems. Under these unique circumstances, UAMPS maintains that it has the right to file a trespass claim to remedy the clear violation of the terms of the Easement. It is also noteworthy, in this context, that the first iteration of Benzer's counterclaim included a claim for trespass damages against UAMPS, claiming that UAMPS "invaded [Benzer's] easement by installing [the Guy Pole] outside of the easement and in the middle of a planned road."

¶77　As should be evident from the far-flung and dated citations employed by both sides, the question of whether a dominant estate owner is always, under any circumstance, forbidden from filing a trespass claim against a servient estate owner is one that has yet to be definitively answered under Utah law. And we do not need to answer it today. For present purposes, it suffices to state that we do not consider UAMPS's trespass claim, filed under the unique circumstances of this case, to have been one "bordering on frivolity," *see Cady*, 671 P.2d at 151 (quotation simplified), especially where, as here, Benzer filed a similar claim against UAMPS.

¶78　Moreover, we note that UAMPS's claimed damages remedy was stated in the alternative, and that UAMPS eventually opted for injunctive relief and abandoned its claim for trespass damages. This is consistent with Utah law and our pleading standards, which "permit litigants to plead inconsistent theories of recovery in the alternative." *See Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 74, 361 P.3d 63. Indeed, the district court determined that, under the doctrine of election of remedies, it was appropriate to dismiss UAMPS's trespass claim, noting that UAMPS's success in seeking a declaratory judgment "effectively mooted" the trespass claim. UAMPS did not file a cross-appeal to challenge that decision, and it does not—to our knowledge—claim any right to

reinstate that claim on remand. The dismissal of UAMPS's trespass claim may well result in a determination that Benzer was the "prevailing party" on that claim, but in our view the fact that UAMPS brought that claim merely as an alternative to its claim for declaratory relief weighs in favor of the conclusion that its claim was not without merit.

¶79 We therefore resolve this issue by resorting to our own de novo assessment that, on this record, UAMPS's trespass claim was not "without merit," as that term is used in the bad-faith statute. On that basis, and without having any need to consider the "prevailing party" or "bad faith" elements in view of that assessment, we affirm the district court's denial of Benzer's request for an award of attorney fees under the bad-faith statute.[8]

CONCLUSION

¶80 The district court did not err in dismissing, on mootness grounds, that portion of Benzer's counterclaim having to do with the relocated Guy Pole. We affirm the court's conclusion that the Realignment Statute places the burden of proof on the servient

---

8. In its brief, Benzer also complains about a number of statements the district court made in its various rulings, asserting that the court made improper factual findings in connection with various summary judgment rulings. As Benzer sees it, the court improperly "weighed evidence" and "made inferences in favor of the moving party," and it asks us to address these alleged errors in this appeal. We decline this invitation, because Benzer has not demonstrated that these asserted "findings of fact" have any bearing on the issues presented in this appeal, and because Benzer has not explained how any of these issues might matter to the narrow issues—concerning only Benzer's claim for realignment of the guy wires on Lot 55—remaining to be decided on remand.

estate owner. And we affirm the court's denial of Benzer's claim for attorney fees under the bad-faith statute.

¶81    However, for the reasons set forth herein, the court erred in dismissing, as a matter of law on summary judgment, Benzer's counterclaim for realignment of the guy wires on Lot 55. We therefore vacate the court's order dismissing that part of Benzer's counterclaim, and we remand this case to the district court for further proceedings consistent with this opinion.

————